S95P1940. CHILDRESS v. THE STATE.

(467 SE2d 865)

FLETCHER, Presiding Justice.

Roddy Elroy Childress was convicted of two counts of murder in the shooting deaths of his niece, Emma Kappus, and her father, Patrick Kappus. The jury found as a statutory aggravating circumstance that the murder of Emma Kappus was committed while Childress was engaged in the murder of Patrick Kappus.[1] The jury sentenced Childress to death for the murder of Emma. He received a consecutive life sentence for the murder of Patrick. Childress was also convicted of theft by taking, for which he received a sentence of 12 months in prison. Childress appeals from the judgments entered by the trial

---

[1] OCGA § 17-10-30 (b) (2).

court.[2] We reverse Childress' convictions on two independent grounds. First, the trial court erred in excluding testimony that Jolene Kappus, widow of Patrick and mother of Emma, violated the rule of sequestration. Jolene's testimony was vital to the state's case, and her impeachment was therefore critical to the defense. Second, under *Rower v. State*,[3] decided after the trial of this case, the court erred in requiring Childress to provide to the state written reports of all experts whom he consulted, whether or not he intended to offer the reports in evidence. Because the court's ruling chilled Childress' use of experts, we find that the error was harmful and requires reversal of Childress' conviction.

1. Childress is the half-brother of Jolene Kappus. It is undisputed that in February 1989, Childress and his young son Jason moved from Texas to Brunswick, Georgia to live with Jolene, her husband Patrick, and their 15-year-old daughter, Emma. In April 1989, the Kappuses decided to move with Childress to Jacksonville, Florida. On Saturday, April 29, the family rented a U-Haul truck and began loading it with their possessions. After a one-day delay in their departure, the family planned to drive to Jacksonville in two vehicles, the rented truck and the family car, on the morning of May 1, 1989.

Jolene, who is deaf and mute, testified at trial through an interpreter that the following events ensued: On the night of April 30, Patrick and Childress stayed up late talking after Jolene and the children had gone to bed. At 10:00 or 11:00 the next morning, Jolene awoke alone. She was unable to locate either Patrick or Emma and asked Childress where they were. Childress told her that they had gone to the store to buy soft drinks. Jolene was skeptical, because the car was still at the house, and her husband and daughter never went to the store on foot. Also, she knew that Patrick had wanted to leave early that day for Jacksonville. After waiting a while for Patrick and Emma to return, Jolene asked Childress again where they had gone. When Childress speculated that they were getting some exercise, Jolene was again skeptical. She stepped outside and looked around the house. She noticed a lock on the door of the shed behind the house and asked Childress about it. Childress told her Patrick had placed it

---

[2] The crimes occurred on May 1, 1989. Childress was indicted on October 3, 1990. On March 12, 1991, the state filed its notice of intent to seek the death penalty. Voir dire commenced on May 2, 1994, and the trial of the case began on May 9, 1994. On May 20, 1994, the jury returned its verdict finding Childress guilty of the murders and theft. The jury returned its sentencing phase verdict on May 21, 1994, and the trial court sentenced Childress that same day. Childress filed a motion for new trial on June 17, 1994 and amended it on March 15, 1995. The trial court denied the motion on June 7, 1995. Greene filed his notice of appeal on July 5, 1995. The case was docketed on August 31, 1995 and orally argued on January 17, 1996.

[3] 264 Ga. 323 (443 SE2d 839) (1994).

there. Jolene continued to wait for a period of time, until Childress finally insisted that she leave for Jacksonville with Jason. Jolene was confused and reluctant, but she did as Childress said, expecting that he would soon follow in the truck with Patrick and Emma. Once in Jacksonville, Jolene was unable to gain access to the house which she thought Childress had rented for her family. She and Jason waited many hours for Childress, who finally arrived alone. He first explained that Patrick and Emma were still in Brunswick and later said that they had flown to see Patrick's father, who was ill. Childress, Jason and Jolene spent the night in Jacksonville in a motel, and thereafter Childress repeatedly abandoned Jolene for extended periods of time, until ultimately he and Jason vanished permanently with the U-Haul, leaving Jolene in a strange city, unable to communicate well, without money or possessions other than her car. On the night of May 2, Jolene slept in the car, and she spent the following night in a homeless shelter. She borrowed a small amount of money for gasoline to drive to Brunswick and back, trying unsuccessfully to find her husband and child. Finally, on May 4, Jolene was able to locate and communicate with a deaf person at Patrick's workplace. Officers were called and began to search for the victims. Ultimately a friend informed Jolene that Patrick and Emma were dead; officers had discovered their bodies hidden beneath a mattress in the shed in Brunswick.

Childress testified at trial to a very different version of events. According to Childress, sometime during the early morning hours of May 1, Patrick woke him and asked him if he knew where Emma was. Patrick was agitated and expressed concern that Emma might be with her boyfriend down the street. Childress told Patrick he did not know where Emma was, Patrick left the house, and Childress went back to sleep. Later, Childress awoke to the sound of voices in the yard. He went outside and saw Patrick and Jolene struggling angrily in a tug-of-war with Emma. Patrick, whose hearing was impaired, was attempting to communicate with Jolene in sign language. In the course of the struggle, Emma fell to the ground, and as Patrick tried to help her up, a gun which he held in one hand fired, shooting Emma in the head. Both Jolene and Patrick reacted with shock. Jolene then grabbed the gun and aimed it at Patrick, who walked backward away from her, toward the shed. As Jolene continued to inch toward Patrick with the gun, Childress ran to Emma to check her vital signs. After a few moments, Jolene fired at Patrick three times and threw down the gun. Childress went to where Patrick lay next to the shed and determined that he, like Emma, was dead from a gunshot to the head.

Childress testified that he and Jolene were both very shaken. Jolene's state of mind was such that the two could not communicate well about what to do. Childress' thoughts raced. He wondered

whether he should call the police or an ambulance, worried that eight-year-old Jason would wake and see the bodies, worried about what the neighbors might have seen or heard, and feared the consequences for his sister and himself of calling for help. Childress was on probation for receiving stolen property in Texas and would be placed in jail if it became known that he had violated the terms of his probation by leaving the state. He would immediately lose custody of Jason, probably to his former wife who Childress felt would not be an appropriate custodial parent because of her recent suicide attempts. While Childress contemplated the possibilities, he attempted to move Emma's body into the house. However, knowing that both victims were beyond resuscitation, Childress abandoned the effort and cooperated with Jolene in moving the bodies to the shed as an interim measure, so that Jason and the neighbors would not see them before Childress had time to think through his dilemma.

Childress further testified that, after a short interval, Jolene went to the shed and retrieved several items from Patrick's pockets, including a check for $200 made out to Patrick as a return for the Kappuses' deposit on the house in Brunswick. Jolene handed Childress a lock from the U-Haul truck and asked him to lock the shed. When Childress went to the shed to lock it, he saw that Jolene had dropped or placed a mattress over the bodies. The two then decided that Jolene would leave for Jacksonville with Jason and that Childress would follow later in the truck after he finished loading it. Eventually Childress, Jason and Jolene were reunited in Jacksonville. Jolene claimed she was unable to locate the house which she and Patrick had rented, so the three spent the night in a motel. The next day, they cashed the check which Jolene had taken from Patrick's pocket. As the hours wore on, Childress became increasingly suspicious of Jolene's behavior and worried that perhaps she was plotting to report to the police that he had killed the victims. Therefore, he fabricated a story that the truck needed repair and left in it with Jason. Childress' own money was missing from his luggage, so he sold a few items from the truck, placed the remainder in storage, bought bus tickets back home to Texas for himself and Jason, and left. Upon arriving in Texas, Childress realized that he and Jason might not be safe there, so he immediately bought tickets to Colorado. Once there, he and Jason stayed in a homeless shelter until Childress could find work. They continued to live in Colorado until Childress was apprehended more than a year later.

Neighbors of the Kappuses in Brunswick testified at trial that shortly before 7:00 a.m. on May 1, 1989, they heard a gunshot, followed by the sound of Patrick yelling, followed closely by three more gunshots. Minutes thereafter, a neighbor observed Childress standing alone near the shed. Within a day after the bodies were discovered, a

warrant issued for Childress' arrest. He was ultimately located and arrested in Colorado in August 1990.

Soon after Childress was incarcerated, he called his sister, Darnell Morris, to discuss arrangements for the custody of Jason. Morris insisted that Childress explain to her what had happened and why he had kept the family uninformed for more than a year. Childress confessed to Morris that he killed the victims, but he said that he shot Emma by accident and Patrick in self-defense. At trial, Childress admitted confessing to Morris but denied the truth of the confession. He explained that, once he had concluded from Morris' comments that Jolene was not in jail, he decided to avoid implicating Jolene and simply to characterize the incident as a mishap rather than a murder.

At trial, an inmate who had been arrested for child molestation and incarcerated with Childress testified for the state. He said that Childress told him on one occasion that Childress had been having anal sex with his niece over a period of time. The witness further testified that on another occasion Childress said he had gotten caught at something and that people wound up dead. After Childress testified and denied having any sexual contact with Emma, a school friend of Emma's testified in rebuttal that she had seen Childress touch Emma in a sexual manner. She further testified that, days before Emma's death, she saw Emma lying naked on her bed crying with her ear bleeding and that Childress walked into the room naked, from the adjacent bathroom. The state theorized at trial that Childress shot the victims in the shed after being caught by Patrick in the act of sexually molesting Emma. No forensic tests were conducted on Emma's body which might have substantiated or refuted that theory.

The state introduced evidence that a $200 check made out to Patrick had been cashed after his death. Childress' finger and palm prints were identified on the check.

The evidence is sufficient to enable a rational trier of fact to find Childress guilty of the crimes charged beyond a reasonable doubt.[4]

2. Jolene testified extensively for the state. The day after she completed her testimony, her half-sister Morris testified. Sometime thereafter, the defense learned that Jolene had violated the rule of sequestration by discussing her trial testimony with Morris on two occasions before Morris was called to the stand. Jolene and her boyfriend first visited with Morris on an evening between two days of Jolene's testimony and again the night before Morris was scheduled to testify. After learning these facts, the defense sought to recall Morris to elicit testimony regarding the violations.

---

[4] *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

The court allowed the defense to make a proffer of Morris' testimony. In the proffer, Morris testified that Jolene, speaking through her boyfriend as a sign language interpreter, told Morris in each conversation what her own testimony had been regarding subject matter that involved Morris. For example, Jolene told Morris that she testified that in 1989, after she and Morris discussed Patrick and Emma's deaths for the first time, Jolene had *not* torn up the written notes through which the two had communicated but instead had left the notes with Morris. This and other alleged facts conflicted with Morris' recollection of events. Morris testified in the proffer that, although she was unable to state with certainty that Jolene attempted to influence her testimony, Morris "felt" that Jolene attempted to do so. Morris also testified that Jolene's boyfriend said not to tell anyone that the three had spoken, because the witnesses were not supposed to discuss their testimony. Morris testified, finally, that she did not alter any of her testimony as a result of her conversations with Jolene.

Following the proffer, the court excluded all evidence that Jolene had violated the rule of sequestration. The court reasoned that, because Morris' testimony was not altered as a result of the communications, the fact of the violations was irrelevant. The defense clearly articulated, however, that the purpose of the offered evidence was to impeach Jolene, the state's primary witness, to show her bias, motive and interest in affecting the outcome of trial.

Pursuant to OCGA § 24-9-61, "[i]n all cases either party shall have the right to have the witnesses of the other party examined out of the hearing of each other." The rule "extends to communications, direct and indirect, between witnesses outside the courtroom."[5] The parties invoked the rule of sequestration at the commencement of the trial of this case. Therefore, Jolene's communications with Morris were in clear violation of the rule.

The state does not dispute that Jolene violated the rule. Instead, the state argues, first, that the trial court was correct that Jolene's rule violations were irrelevant, because they did not affect Morris' testimony. Second, the state argues that Childress failed to request the appropriate remedy at trial and thereby waived the issue.

It is settled law that a violation of the rule of sequestration goes to the credibility of the testimony of the witness in violation.[6] Generally, however, our cases have involved witnesses who sat in the courtroom during trial and whose testimony might therefore have been affected by their own violation.[7] We have not had occasion to consider whether evidence of a knowing violation of the rule of sequestration

---

[5] *Lackey v. State*, 246 Ga. 331, 335 (271 SE2d 478) (1980).
[6] *Johnson v. State*, 258 Ga. 856, 857 (376 SE2d 356) (1989).
[7] See, e.g., *Blanchard v. State*, 247 Ga. 415, 416-417 (276 SE2d 593) (1981).

outside the courtroom, whether or not it alters another witness' testimony, is relevant to the credibility of the violator.

The purpose of the rule of sequestration is to prevent a witness who has not testified from having her testimony affected by that of another witness.[8] As the Court of Appeals observed:

> [O]bviously, if the purpose of the rule is to be adequately served, witnesses may not be *told* what prior witnesses have said either. Otherwise the same undesired influence can result to impurify their testimony and render its credibility questionable. The clear import of the statute is to preserve the integrity of testimony, with the ultimate goal of arriving at the truth.[9]

To serve the goal of the rule of sequestration, witnesses are not only forbidden to receive information regarding other witnesses' testimony; they are forbidden to give such information. The jury in this case could infer that Jolene intended to influence Morris' testimony and that she set about to do so in secret in violation of the court's instructions. A witness' effort to thwart the goal of the rule of sequestration can surely implicate her credibility, calling into question her motivations and interest in the outcome of trial. The impact on the jury's assessment of Jolene's credibility, if it found that she intended to alter Morris' testimony, would likely be no less than its concern about the integrity of the testimony of Morris, or of any passive recipient of information about what others have said on the stand. We therefore hold that, irrespective of the violating witness' success in affecting another's testimony, the jury may consider an out-of-court violation in assessing the credit to be given the testimony of the violator. Therefore, the court erred in excluding evidence that Jolene violated the rule of sequestration.

Childress has not waived this issue. On the contrary, he took precisely the appropriate steps to preserve it. The state is correct that our prior cases indicate that the remedy for a violation of the rule of sequestration is to request the court to charge the jury that the violation should be considered in determining the weight and credit to be given the testimony of the witness.[10] However, in most cases articulating that remedy, the witness whose credibility was at issue had been sitting in the courtroom throughout some portion of trial.[11] Therefore, the appropriate remedy was to have the court charge the jury regard-

---

[8] See *Lackey*, 246 Ga. at 334.

[9] *O'Kelley v. State*, 175 Ga. App. 503, 504 (333 SE2d 838) (1985).

[10] See, e.g., *Wright v. State*, 246 Ga. 53 (268 SE2d 645) (1980).

[11] See, e.g., *Thomas v. State*, 262 Ga. 754, 756 (425 SE2d 872) (1993).

ing the obvious and admitted fact of the violation. In this case, in contrast, the fact of the violation was not obvious, and it would be highly inappropriate for the trial court essentially to testify to hearsay regarding the violation in the course of charging the jury.[12] The only appropriate remedy in this case was to admit Morris' testimony regarding the violation.[13] Had the court admitted the evidence, the defense could then ask the court to charge the jury, after the testimony or just prior to deliberations, that the violation could be considered in weighing Jolene's credibility.[14]

Impeachment of Jolene's credibility was as critical for the defense as her testimony was vital to the state. We can infer from the verdict and death sentence that the jurors believed Jolene's account of events, discounted the evidence that was admitted to impeach her, and rejected the defense theory that Jolene was herself the killer. We cannot assume that the evidence of her possible attempt to influence Morris' testimony, had it been admitted, would have had no bearing on these conclusions or on the outcome of either phase of trial. Therefore, we must reverse Childress' conviction.

3. The state moved for an order requiring the defense to produce any written reports of experts that it intended to introduce at trial. Despite the limited nature of the state's request, and over strenuous defense objections, the trial court not only granted the motion, but also issued an order stating that its ruling was controlled by *Sabel v. State*[15] and quoting the *Sabel* opinion at length, as follows:

> [I]n view of the right of a defendant in a criminal case to obtain copies of scientific reports, we find that requiring the report of the defendant's expert to be reduced to writing and made available to the state will further the search for the truth. If the defendant does not call the expert as a witness, the state may call the defendant's expert without adding his or her name to the list of witnesses, or may argue to the jury that the defendant would have called the expert had the result of the testing been favorable to the defendant. Other safeguards appropriate to the circumstances may be imposed by the trial court.[16]

Thus, the order as written required that Childress have all expert re-

---

[12] See *O'Kelley v. State*, 175 Ga. App. at 504 (court should not have included, in charge regarding violation of rule of sequestration, recitation of facts to which witness had testified out of jury's presence; this amounted to testimony by the court).

[13] See id. at 504, n. 3.

[14] See id.

[15] 248 Ga. 10 (282 SE2d 61) (1981).

[16] Id. 248 Ga. at 18.

ports reduced to writing and made available to the state whether or not he intended to call the experts at trial and whether or not their opinions were favorable to the defense, and permitted the state to use at trial the reports of uncalled defense experts.

The order, when issued, was correct under *Sabel.* However, shortly after trial, *Sabel* was overruled in pertinent part by *Rower v. State.*[17] In *Rower,* we held that the state may discover only the written reports of experts that the defendant intends to introduce at trial.[18] Although *Rower* was decided after this case was tried, because Childress' appeal was "in the pipeline," the *Rower* rule applies, and there was error.[19]

The state concedes that the trial court's ruling was erroneous under *Rower.* However, citing recent opinions in which we have confronted this issue, the state urges us to hold that the error was harmless. We cannot so find.

Childress contends that he was harmed by the trial court's ruling because it chilled his use of expert witnesses. For example, before the trial court issued its order under *Sabel,* Childress sought from the court and was awarded funds to hire a ballistics expert. However, his subsequent concern that any unfavorable opinions rendered by the expert would have to be reduced to writing and produced to the state, which could make use of those findings at trial, caused him to forego the opportunity to work with the expert at all.

The state contends that in this case, as in *Wellons v. State,*[20] there was no harm, because a ballistics expert could not have rendered any opinion that would have been useful to Childress' defense. We cannot so blithely dismiss the potential value to the defense of the expert's assistance. At trial, the state theorized that Childress shot both victims in the shed and then moved and concealed their bodies. The state introduced testimony regarding the location of the bullets and casings, and used that evidence to support its theory. Childress alleges that the shootings occurred just outside the shed. He alleges that Patrick shot Emma and dropped the gun, whereupon Jolene took the gun and shot Patrick, and that Jolene and Childress then together moved the bodies into the shed where Jolene concealed them. Childress argues that he would have used the ballistics expert to obtain information concerning the ejection patterns of the murder weapon and to obtain an opinion whether the location of the bullets and casings corroborated his account of where the shootings occurred. His arguments persuade us that the ballistics expert might have made

[17] 264 Ga. 323, 325 (443 SE2d 839) (1994).
[18] Id. See also *Johnson v. State,* 265 Ga. 833, 834 (463 SE2d 123) (1995).
[19] See *Mobley v. State,* 265 Ga. 292, 294 (455 SE2d 61) (1995).
[20] 266 Ga. 77, 82 (463 SE2d 868) (1995).

a significant contribution to Childress' defense. We are also persuaded that, had the ballistics expert's opinions supported the state's theory, the expert's report could have been devastating to Childress' defense. Therefore, we must agree that the error was harmful and necessitates a reversal of Childress' conviction.

Before retrial, Childress must be given an opportunity to renew his requests for funding for expert assistance and to consult with his experts in confidence.

4. Childress contends that a series of erroneous rulings by the trial court compelled him to testify and that, therefore, his convictions must be reversed. Although we do not reach the question whether the errors culminated in harm to Childress, we agree that they were serious and warrant discussion due to the possibility that the issues could arise again on retrial.

After Jolene had testified at trial, Childress attempted to elicit from a defense witness, Richard Giese, a statement Jolene allegedly made to him two years after the murders to the effect that Patrick froze in shock when he saw that Emma was shot in the head. The evidence, though subject to varying explanations, tended to suggest that Jolene might have witnessed the shooting, in contrast to her testimony at trial that she did not, thereby calling into question her entire version of events.[21] The court disallowed the questioning on the ground that it called for hearsay and could not be admitted as a prior inconsistent statement until the defense had laid a proper foundation through Jolene. The defense argued that the statement was not hearsay and that it was admissible as impeachment evidence even if not as a prior inconsistent statement. However, the defense agreed to recall Jolene to the stand at a later time.[22] Thereafter, when Childress attempted to recall Jolene for the purpose of asking her about the statement, the court refused to allow it, agreeing with the state that no evidence in the trial made the statement relevant and that the testimony would remain irrelevant until Childress testified to his own version of events:

---

[21] In assessing the import and meaning of this evidence, and all evidence elicited from or regarding deaf witnesses, we appreciate that translation of statements into and out of sign language, and the different styles of expression of deaf and hearing persons, complicated the tasks of the trial court, the attorneys, the witnesses and, when they were given an opportunity to hear the evidence, the jurors. We are therefore mindful of the possibility of misinterpretation.

[22] Defense counsel did elicit from Giese that in another conversation in 1994, Jolene told Giese in sign language, "Why Patrick and Emma had died, by Roddy. He helped me for the money." Based on this and other evidence, the defense theorized that Jolene did not kill Patrick in a moment of passion, as it seemed to Childress at the time, but that she in fact took advantage of a unique opportunity to effectuate her goal of collecting the proceeds of Patrick's life insurance policy. After many years of marriage, Patrick had only recently made her the beneficiary.

PROSECUTOR: There is no — there is no evidence in the trial of this case which makes that relevant. The defense can say, "That's my defense." But it ain't a defense yet.

THE COURT: That's true.

PROSECUTOR: Not until the defendant gets up —

THE COURT: That's true.

PROSECUTOR: — and testifies to that.

THE COURT: That's true.

PROSECUTOR: Mr. Crowe may want to call her after that, but not at this point.

THE COURT: Let me tell you what. It's not relevant yet. He's right. . . .

The defense then acquiesced. Thereafter, Childress took the stand and testified at length about the victims' deaths and surrounding events.

On cross-examination, the state questioned Childress extensively about whether he had had a sexual relationship with Emma, and he vehemently denied the allegations. The state elicited from Childress many damaging admissions about various acts of dishonesty, about the fact that he had been on probation for receiving stolen property, about his older son's incarceration for armed robbery, and about the fact that he kept his younger son out of school the entire time he had been in hiding.

After Childress testified, the defense recalled Giese to the stand. Giese testified that he had visited with Jolene and her then husband Johnnie Serak in Nebraska in 1990 or 1991, and one morning, when he and Jolene were alone, she began retelling the story of the murders. Giese testified as follows:

And then Jolene started telling a story. "When Emma was laying there, Pat saw it and kind of froze," that someone had shot her, and that was it. And I said, "Who?" But she said nothing . . . . That Emma was laying there. Pat saw it and he just kind of — his mind froze. He was like he was in shock, you know, just shock. Someone had shot her in the head.

On rebuttal, the state called to the stand a young woman who had been friends with Emma in high school. In contradiction to Childress' protestations at trial that he never had sexual contact with Emma, she testified that she personally saw Childress touch Emma in a sexual manner and that, days before Emma died, she saw Childress enter Emma's bedroom naked, as Emma lay crying on her bed, naked and bleeding from her ear.

The court committed a series of errors. First, the court erred in refusing to allow admission of Giese's testimony at the outset. The court was correct that, under OCGA § 24-9-83, before Jolene could be impeached by her prior inconsistent statements, the defense would have to lay a foundation by calling to her mind with as much certainty as possible the time, place, person and circumstances attending the former statements.[23] However, pursuant to OCGA § 24-9-82, a witness may be impeached by disproving the facts to which she testified.[24] Jolene's alleged statements to Giese, whether or not they were true, tend to suggest that Jolene may have witnessed Emma's death. If so interpreted, they clearly contradict Jolene's testimony regarding the events of May 1, 1989. The statements were not hearsay, because they were not offered to prove the truth of the matter asserted.[25] Thus, the statements were admissible through Giese pursuant to OCGA § 24-9-82.[26]

The court erred a second time in refusing to permit the defense to recall Jolene to lay a foundation for admission of the statements. OCGA § 24-9-83 allows counsel to recall a witness at any time during trial for the purpose of laying a foundation for the introduction of a prior contradictory statement, so long as the statement is relevant to the case. Jolene's statements were not only relevant but vital to impeach the story she told as the state's key witness.

Although each of these two rulings was clearly erroneous, and Childress properly preserved both issues, he ultimately was able to introduce Giese's testimony at trial. However, to do so he had to pay a very high price. The court's rulings forced Childress to choose between foregoing admission of highly relevant evidence, which the jury could interpret to impeach Jolene's critical account of events, and testifying before he could assess whether his testimony was needed in light of the strength of the balance of his evidence. By forcing this choice, the trial court committed a grave error.

This case presents an issue very similar to that confronted by the United States Supreme Court in *Brooks v. Tennessee.*[27] In *Brooks*, the court found unconstitutional a Tennessee statute requiring a defendant in a criminal proceeding to testify first, before calling any other witnesses, or to forego the opportunity to testify at all. The court held that the statute infringed the right against self-incrimination and deprived the defendant of the "guiding hand of counsel" in

---

[23] See *Meschino v. State*, 259 Ga. 611, 614 (385 SE2d 281) (1989).

[24] See *Francis v. State*, 266 Ga. 69, 71 (463 SE2d 859) (1995).

[25] See *Fugitt v. State*, 256 Ga. 292, 295 (348 SE2d 451) (1986).

[26] By admitting Giese's testimony after Childress testified, without requiring Childress to recall Jolene, the trial court appears to have conceded that the defense did not have to lay a foundation for admission of the evidence pursuant to OCGA § 24-9-83.

[27] 406 U. S. 605 (92 SC 1891, 32 LE2d 358) (1972).

timing the introduction of his testimony.[28] The court noted that the defendant's choice to take the stand "carries with it serious risks of impeachment and cross-examination" and may open the door to damaging evidence that otherwise would have remained inadmissible.[29] Before other witnesses have testified, the defendant is not in a position to assess whether the benefit of testifying is worth the risks involved.

> Although a defendant will have some idea of the strength of his evidence, he cannot be absolutely certain that his witnesses will testify as expected or that they will be effective on the stand. They may collapse under skillful and persistent cross-examination, and through no fault of their own they may fail to impress the jury as honest and reliable witnesses. . . .
>
> Because of these uncertainties, a defendant may not know at the close of the State's case whether his own testimony will be necessary or even helpful to his cause. Rather than risk the dangers of taking the stand, he might prefer to remain silent at that point, putting off his testimony until its value can be realistically assessed.[30]

The court further noted that the rule might "compel even a wholly truthful defendant, who might otherwise decline to testify for legitimate reasons, to subject himself to impeachment and cross-examination at a time when the strength of his other evidence is not yet clear."[31] Finally, the court noted:

> Whether the defendant is to testify is an important tactical decision as well as a matter of constitutional right. By requiring the accused and his lawyer to make that choice without an opportunity to evaluate the actual worth of their evidence, the statute restricts the defense — particularly counsel — in the planning of its case. The accused is thereby deprived of the 'guiding hand of counsel' in the timing of this critical element of his defense.[32]

The trial court's rulings in this case, like the Tennessee statute at issue in *Brooks*, impermissibly restricted the decision of the defense

---

[28] Id. at 609, 612-613.
[29] Id. at 609.
[30] Id. at 609-610.
[31] Id. at 612.
[32] Id. at 612-613.

whether, and when in the course of presenting its evidence, the accused should testify.[33]

The state argues that, although the court's ruling erroneously forced Childress to testify before he could admit impeaching evidence, the error is harmless, because Childress would have testified anyway. It does appear, from the content of defense counsel's opening statement, that counsel probably envisioned Childress taking the stand. On the other hand, nothing bound Childress to do so, and it remained his right throughout trial to decline to testify. Had he been able to introduce all of his properly admissible evidence impeaching the state's key witnesses before confronting the decision whether to testify, he and his counsel might reasonably have decided to avoid the risks of his taking the stand. His counsel could then argue that the state simply failed to prove Childress' guilt beyond a reasonable doubt. Furthermore, if the court's rulings did in fact cause Childress to testify when he would not otherwise have done so, the harm to Childress stemming from that decision is obvious.

The state next contends that Childress failed properly to preserve this issue, because he never specifically articulated to the trial court that its final ruling required him to testify or required him to do so before presenting other evidence. Childress responds that his vehement objections to the court's rulings, including the ruling which forced him to testify, coupled with the state's insistence that Childress had to testify first before offering the impeaching evidence, render the state's argument meritless. He further responds that, given the highly prejudicial nature of cross-examination and of the state's evidence in rebuttal, there is a reasonable probability that the trial court's ruling changed the outcome of the first or second phase of trial.[34]

Because we reverse Childress' convictions on other grounds, we need not resolve the question whether the trial court's errors ultimately harmed Childress by forcing him to testify when he would not otherwise have done so,[35] or the question whether that issue was properly preserved. We caution, however, that the erroneous rulings should be avoided when this case is retried.

5. We have reviewed Childress' remaining enumerations of error and find that each of them either lacks merit or is unlikely to recur on retrial.

6. As the evidence supports the jury's finding of the statutory aggravating circumstance,[36] on retrial the state may again seek the

---

[33] See id. at 613.

[34] See *Todd v. State*, 261 Ga. 766, 767 (410 SE2d 725) (1991).

[35] But see *Cruz-Padillo v. State*, 262 Ga. 629, 631 (422 SE2d 849) (1992).

[36] OCGA § 17-10-30 (b) (2).

death penalty.[37]
*Judgment reversed. All the Justices concur.*

DECIDED MARCH 15, 1996.

*Lane & Crowe, Robert L. Crowe, M. Seth Rosenthal,* for appellant.

*Glenn Thomas, Jr.,* District Attorney, *John B. Johnson III,* Assistant District Attorney, *Michael J. Bowers,* Attorney General, *Susan V. Boleyn,* Senior Assistant Attorney General, *Wesley S. Horney,* Assistant Attorney General, for appellee.

---

[37] See *Moore v. State,* 263 Ga. 11, 14 (427 SE2d 766) (1993).