## S96A1457. EDMOND v. THE STATE.
### (476 SE2d 731)

SEARS, Justice.

Appellant Eugene Edmond appeals from his convictions for malice murder and burglary, claiming that there was insufficient evidence to link him to the killing, and that the trial court erred by (1) admitting evidence that indicated appellant possessed cocaine; (2) charging the jury on corroboration of an accomplice's testimony; and (3) denying appellant's motions for a venue change and sequestered voir dire. After careful consideration and review of the record, we find no error associated with appellant's convictions, and we affirm.

The facts introduced at trial were sufficient to enable a rational trier of fact to find as follows: Early one morning in January 1992, someone kicked in the door to Linda Gordon's home in Waycross, and shot her five times as she sat watching television, killing her.[1] Ms.

---

[1] The murder occurred on January 28, 1992, and appellant was indicted on February 12, 1992 for malice murder, felony murder, aggravated assault, possession of a firearm by a convicted felon, and possession of a firearm during the commission of a crime. The trial commenced on January 11, 1995, and the jury returned its guilty verdicts on January 12, 1995. Also on January 12, 1995, appellant pled guilty to the count charging possession of a firearm by a convicted felon, and the other firearm count was nolle prossed. The trial court sentenced appellant to (1) life imprisonment on the malice murder conviction, (2) twenty years on the burglary conviction, to run consecutively to a federal sentence for drug possession already being served by appellant, and (3) three years on the firearm conviction, to run concurrently to the federal sentence. The court's sentencing order was filed on January 19,

Gordon's son, Reginald Moody, was upstairs sleeping at the time of the killing. Moody later testified that he had broken into appellant's home on several occasions, and had stolen various items, including jewelry, guns, cash, and narcotics. Appellant had warned Moody's father that if the burglaries and thefts did not cease, appellant would retaliate against Moody.

On the day before the killing, Moody broke into appellant's mother's home, where he terrorized appellant's younger brother, whom Moody told that he intended to shoot appellant. When told of this incident, appellant became visibly upset. When asked by appellant, appellant's younger brother identified the intruder's gun as one that matched a description of Moody's gun.

Appellant's accomplice Cedric Smith later confessed to the killing of Ms. Gordon. Smith was variously identified by witnesses, including appellant, as appellant's "employee," "right hand man," and "first lieutenant." Smith testified against appellant at trial, and stated that on the night following Moody's final burglary of appellant's home, appellant had instructed Smith to "do" Moody. Appellant told Smith that he wanted Moody paralyzed "so he would regret it for the rest of his life," but that if Moody got killed in the process, that would be acceptable. Smith testified that at appellant's instruction, he left the local lounge where they were speaking, retrieved their guns and changed into camouflage clothing before returning to the lounge. Smith testified that appellant then drove to within several blocks of Moody's home. Smith then walked to Moody's home, looked into a window, and saw someone watching television, whom he assumed to be Moody. He then burst into the home, and began shooting, only to discover that it was Ms. Gordon watching television, not Moody. Moody was initially arrested for the crime. The next night, appellant was celebrating at the lounge, and was overheard to say that he was pleased that Moody had been arrested.

Later that night, Smith was arrested for the murder. Thereafter, appellant told Smith's mother not to worry, because he and Smith had been together the entire previous night and he would provide Smith with an alibi. Appellant's arrest followed. At trial, appellant testified on his own behalf. He stated that Moody had stolen from him on several occasions. He testified that Smith had taken it upon himself to go after Moody, without any urging from appellant.

1. These facts, when construed most favorably to the jury's ver-

1995, and appellant timely filed a motion for new trial on January 20, 1995. The transcript was certified by the court reporter on August 31, 1995, and the motion for new trial was denied on January 3, 1996. Appellant filed a notice of appeal with the Court of Appeals on January 23, 1996. The appeal was transferred to this Court on May 31, 1996 and docketed on June 4, 1996. The appeal was orally argued before the full Court on September 17, 1996.

dict, were sufficient to enable a rational trier of fact to find appellant guilty beyond a reasonable doubt of the crimes of which he was convicted.[2]

2. Appellant contends that the trial court erred in denying his motion for directed verdict, because there was insufficient evidence to corroborate the testimony of appellant's accomplice, Smith. In support of this contention, appellant points to the testimony of several witnesses that contradicted Smith's testimony in several key respects.

While the testimony of a single witness usually is sufficient to establish a fact, in order to sustain a felony conviction based upon the testimony of an accomplice, there must be independent corroborating evidence which connects the accused to the crime.[3] While such corroborating evidence must do more than merely "cast on the defendant a grave suspicion of [doubt],"[4] it may consist entirely of circumstantial evidence, or evidence of an accused's conduct before and after the crime that infers he participated therein.[5] The sufficiency of the corroborating evidence is a matter for the jury, and if the verdict is based upon the slightest evidence of corroboration connecting an accused to a crime, even if it is circumstantial, it is legally sufficient.[6]

Our review of the record shows that there was sufficient corroborating evidence submitted in support of Smith's testimony to satisfy these requirements and warrant the denial of appellant's directed verdict motion. First, there was evidence that appellant had confronted Moody's father and warned that unless Moody stopped breaking into his home, he would retaliate against Moody. Second, there was evidence showing that appellant had separate motives to stop Moody from breaking into his home in the future, and to retaliate against Moody for stealing from him in the past. Moreover, the evidence showed that before the murder, appellant had acted visibly upset upon learning of the most recent break-in. Furthermore, it was shown that after the murder, appellant was observed celebrating and offered to provide Smith with an alibi after Smith was arrested. Under the case law discussed above, we find that this evidence satisfies the requirement that an accomplice's testimony must be independently corroborated, and we reject this enumeration.

3. Appellant's contention that the trial court improperly charged the jury on the corroboration requirement for an accomplice's testimony has been waived because the charge given was requested by

---

[2] *Jackson v. Virginia,* 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

[3] See OCGA § 24-4-8; *Parkerson v. State,* 265 Ga. 438 (457 SE2d 667) (1995).

[4] *Bradford v. State,* 262 Ga. 512, 513 (421 SE2d 523) (1992).

[5] *Parkerson,* 265 Ga. at 439.

[6] *Bradford,* supra.

both appellant and the State.[7] Furthermore, we find no error in the charge given, as it was virtually identical to the suggested pattern instruction on accomplice testimony corroboration.[8]

4. Appellant contends that the trial court erred by admitting evidence that Moody, the intended murder victim, had stolen narcotics from appellant. As part of its effort to establish a motive for appellant to have killed Moody, the State introduced evidence that some time before the murder, Moody had stolen two kilograms of cocaine that belonged to appellant. A ruling on appellant's motion in limine seeking to exclude this evidence was deferred until the trial court could determine whether it tended to show motive. After Moody himself testified at trial as to his theft of the cocaine, the trial court denied the motion in limine and allowed the evidence. Appellant argues that because the evidence showed that appellant possessed cocaine, the trial court's ruling improperly allowed the State to independently put appellant's character in issue before the jury, without appellant's first having opened the door to such character evidence.[9] Appellant urges that the evidence showing that he possessed cocaine was not highly probative of his guilt on the murder charge, and should not have been admitted into evidence.

Our review of the record shows that on cross-examination, appellant admitted that Moody stole cocaine that appellant "had a possessory interest in," and that no objection was raised to that testimony. Hence, it appears that this issue has not properly been preserved on appeal.[10] However, notwithstanding any waiver of this issue, there are several well-recognized instances when the State may introduce evidence that incidentally prejudices a defendant, but which falls short of placing his character in issue in violation of OCGA § 24-9-20.[11] We find that this case involves two such instances, as the evidence showing that appellant possessed cocaine (1) primarily established an adversarial relationship between appellant and Moody, and (2) established a retaliatory motive for appellant to have killed Moody. Therefore, the evidence was relevant, and there was no error in its admission.

5. Appellant contends that the trial court erred in denying his motions for a change of venue and for sequestered voir dire of the venire. Appellant's claims of error with regard to these two rulings

---

[7] See *McMichen v. State*, 265 Ga. 598, 606 (458 SE2d 833) (1995); *Edwards v. State*, 235 Ga. 603 (2), 604 (221 SE2d 28) (1975).

[8] See Council of Superior Court Judges of Georgia, Suggested Pattern Jury Instructions, Vol. II, Part 3, p. 52 (1991).

[9] See OCGA § 24-9-20 (b).

[10] See *Hartman v. State*, 266 Ga. 613, 614 (469 SE2d 163) (1996); *Smith v. State*, 210 Ga. 713, 714 (82 SE2d 507) (1954).

[11] See *Rotino v. State*, 259 Ga. 295 (380 SE2d 261) (1989).

are interdependent. The proper test for determining whether a change of venue is warranted due to pre-trial publicity is whether such publicity has caused the prospective jurors to form intractable opinions concerning the guilt or innocence of the accused.[12] Appellant contends that the trial court's refusal to grant his request for sequestered voir dire precluded him from making adequate inquiry into the prospective jurors' knowledge of pre-trial publicity, and thus improperly curtailed him from establishing that a change of venue was necessary in order to ensure appellant a fair trial.

The decision whether to grant sequestered voir dire lies within the discretion of the trial court, and a showing of prejudice stemming from the denial of sequestered voir dire is necessary in order to show an abuse of such discretion.[13] As explained above, the prejudice complained of by appellant is an alleged inability to establish that there should have been a change of venue. However, this contention fails because, as explained below, a change of venue was not required in this case.

We have held that a change of venue is necessary only when either the atmosphere in the community in which an accused is to be tried is so inherently prejudicial that a fair trial cannot be had, or where the predisposition of individual jurors is such that a fair trial is not possible.[14] As evidence that the pre-trial atmosphere in Waycross was so saturated with publicity adverse to appellant that he could not receive a fair trial in that community, appellant points to ten newspaper articles that appeared in the Waycross Journal Herald. However, our review of these articles shows that only four of them actually refer to appellant in connection with the murder of Ms. Gordon. The other articles primarily refer to appellant in connection with his arrest and plea of guilty on separate federal drug trafficking charges, and were published roughly three years before the trial in this case. Two of the newspaper articles refer to a different charge of drug trafficking for which appellant was acquitted, and were published nine years before the trial in this case. One of the articles concerns a fist fight that occurred between appellant and another inmate at the jail in which he was held pending trial, and another article profiling the district attorney does not mention appellant at all. On the basis of these few newspaper articles alone, without more, the trial court did not err in finding that the community atmosphere was not so inherently prejudicial as to prevent appellant from receiv-

---

[12] See *Waters v. State*, 248 Ga. 355, 361 (283 SE2d 238) (1981).

[13] *Rhodes v. State,* 264 Ga. 123, 125 (441 SE2d 748) (1994); *Finney v. State*, 253 Ga. 346, 347 (320 SE2d 147) (1984).

[14] *Lemley v. State*, 258 Ga. 554, 558 (372 SE2d 421) (1988) (citing *Patton v. Yount*, 467 U. S. 1025 (104 SC 2885, 81 LE2d 847) (1984)).

ing a fair trial, thereby warranting a change of venue. To the contrary, these articles could only possibly show that the public was somewhat informed about the murder and about appellant through the news media. However, "[b]eing informed or even misinformed is not always the same as being inflamed or prejudiced."[15]

This conclusion is borne out by our review of the record on voir dire, which fails to show prejudice on the part of any individual juror. Of the 36 prospective jurors subjected to voir dire, only two answered affirmatively when asked by the court whether they had any knowledge of the case. One of these prospective jurors, Flynn, was knowledgeable because the murder took place near her home, and she did serve on the jury. The other prospective juror, Burse, was knowledgeable about the murder because he had read newspaper articles concerning the crime. Even though Burse stated that the articles would have no effect on his ability as a juror, he did not serve on the jury. Of the six prospective jurors who stated that they either knew appellant by his name and/or face, or knew a member of his family, all but one stated affirmatively that their knowledge of appellant's identity would have no bearing on their ability to evaluate the case impartially. One prospective juror, Preston, was excused after indicating that based on his acquaintance with appellant, he could not be impartial. Of these six individuals, two (Flynn and Hill) served on the jury.

When asked by defense counsel, 14 prospective jurors said that they had seen a newspaper article concerning the case published the week preceding trial in which appellant was described as a "drug kingpin." More than one time, the trial court persistently inquired whether having read the article would have any impact on the jurors' abilities to adjudge the case, and whether they could refrain from considering the article in their deliberations. All of the 14 prospective jurors told the court that their reading of the article would have no impact whatsoever on their ability as jurors. Of these fourteen individuals, six eventually served on the jury. Especially in light of the trial court's repeated questioning of these jurors regarding the article and its effect on them as jurors, we cannot say that simply because they read this single article, without more, these six jurors became individually biased and therefore deprived appellant of a fair trial.[16] Indeed, a contrary ruling could lead to the impractical, if not absurd, result of precluding anyone who has ever read a news account identifying one accused of a crime from sitting on the jury when the accused is tried.

---

[15] *Lemley*, 258 Ga. at 556.
[16] See id.

Accordingly, we find that because the pretrial publicity touching upon this matter did not infect either the community atmosphere or the minds of individual jurors so as to jeopardize appellant's right to a fair trial, a change of venue was not required in this case. Because there was no need to change the venue, it follows that no prejudice resulted from the refusal to permit sequestered voir dire. Therefore, this enumeration is rejected.

*Judgment affirmed. All the Justices concur.*

DECIDED OCTOBER 15, 1996 —
RECONSIDERATION DENIED NOVEMBER 8, 1996.

*E. Kontz Bennett, Jr.,* for appellant.

*Richard Currie, District Attorney, Michael J. Bowers, Attorney General, Beth Attaway, Assistant Attorney General,* for appellee.