S99P0584. TERRELL v. THE STATE.
(523 SE2d 294)

CARLEY, Justice.

A jury found Brian Keith Terrell guilty of malice murder and ten counts of first-degree forgery. For the murder, the jury recommended a death sentence, finding the following statutory aggravating circumstances: the offense of murder was committed while the defendant was engaged in the commission of an aggravated battery; and the offense of murder was outrageously or wantonly vile, horrible or inhuman in that it involved depravity of mind and an aggravated battery to the victim before death. OCGA § 17-10-30 (b) (2), (7). Terrell's motion for new trial was denied and he appeals.[1]

### Jury Selection

1. During voir dire, prospective juror Smith stated that he was a full-time military policeman with the Georgia National Guard, with arrest power. Terrell moved to excuse juror Smith for cause, but the trial court denied the motion stating, "I think he can distinguish the difference between civil and military law." It is well-settled that full-time police officers with arrest powers must be excused if challenged for cause, because it "is inherent in the nature of police duties and the closeness with which such officers are identified with criminal procedures that questions regarding possible bias, fairness, prejudice

---

[1] The victim was murdered on June 22, 1992, and on July 13, 1992, the Newton County Grand Jury indicted Terrell for malice murder, felony murder, and armed robbery. Terrell was also indicted for ten counts of first degree forgery on June 10, 1993. The State dropped the felony murder and armed robbery counts after Terrell's first trial ended in a mistrial. Terrell's second trial began on January 9, 1995, and Terrell was convicted of all remaining counts. The jury recommended a death sentence for the murder on January 20, 1995. In addition to the death sentence, the trial court sentenced Terrell to ten consecutive ten-year sentences for the forgeries. Terrell filed an extraordinary motion for new trial on January 27, 1995, and a motion for new trial on February 8, 1995. The motions were denied on September 4, 1997, and pursuant to an extension of time granted by the trial court, Terrell filed his notice of appeal on October 31, 1997. The case was docketed in this Court on January 15, 1999, and was orally argued on April 13, 1999.

or impermissible influence upon jury deliberations inevitably arise." *Hutcheson v. State*, 246 Ga. 13 (1) (268 SE2d 643) (1980). See also *Harris v. State*, 255 Ga. 464 (2) (339 SE2d 712) (1986). The record clearly shows that juror Smith was a full-time military policeman with arrest power and that he did not meet any of the exceptions to this automatic disqualification rule. Thus, the trial court's erroneous refusal to excuse this juror for cause requires reversal of the convictions. *Hutcheson v. State*, supra. Compare *Mosher v. State*, 268 Ga. 555 (2) (491 SE2d 348) (1997) (law enforcement firearms instructor without arrest power not subject to automatic disqualification); *Denison v. State*, 258 Ga. 690 (4) (373 SE2d 503) (1988) (part-time police officers not subject to automatic excusal for cause); *Cargill v. State*, 255 Ga. 616 (6) (340 SE2d 891) (1986) (active-duty drill sergeant who had served as military policeman and would serve as a military policeman again upon completion of drill sergeant duty not subject to automatic disqualification); *Wilson v. State*, 250 Ga. 630 (4) (a) (300 SE2d 640) (1983) (reserve police officers not subject to automatic excusal). Because our reversal of the convictions will result in a new trial, we will now examine those enumerations raising issues likely to recur on retrial.

### *The Guilt-Innocence Phase of Trial*

2. The evidence presented at trial authorized the jury to find the following: Barbara Terrell, the defendant's mother, had been assisting the victim, seventy-year-old John Watson, with meals and errands since 1989. Watson had a number of health problems and required dialysis three times a week. Barbara Terrell received no compensation for her services, but Watson had promised to include her in his will, and they had discussed marriage. On May 1, 1992, Terrell was released from prison on parole. Watson met Terrell through his mother and Terrell was inside his home on several occasions.

On Saturday, June 20, 1992, Watson called the sheriff's office and reported receiving ten canceled checks, totaling about $8,700, which had been stolen and forged. Some of the checks were made payable to Terrell and the others had been made payable to a former school friend of Terrell, who police later determined was not involved in the forgeries. Due to his feelings for Terrell's mother, Watson asked the sheriff to wait a few days before taking an arrest warrant for Terrell. He told Ms. Terrell to tell her son he would not take a warrant if he returned most of the money by Monday, June 22. Watson relayed this information to her son who promised to repay the money. However, the next day, June 21, Terrell, who had recently bought a car and new clothes despite not having a job, told his

mother that he could not repay the money.

John Watson's body was found on his property at approximately noon on June 22. He had been shot four times and severely beaten in the face and head. The medical examiner testified that either the gunshots or the beating would have been fatal, and that the victim was still alive when receiving all these injuries. Shell casings found on Watson's driveway indicated that the firearm used in the murder was a .38 or .357 caliber revolver. Watson had apparently been shot in his driveway as he was getting into his car to drive to his morning dialysis appointment and then dragged into the brush and beaten.

Jermaine Johnson, Terrell's cousin, confessed to his role in the crime and testified at trial in exchange for a five-year sentence for robbery. He stated that he and Terrell checked into a motel near Watson's house at midnight on June 21. Terrell locked the keys in his blue Cadillac and, despite the assistance of a sheriff's deputy, they were unsuccessful at unlocking the car door. He said that he and Terrell went to bed and awoke at 6:30 a.m. on June 22. They broke a window to get into the Cadillac. Terrell had a .357 or .38 caliber revolver and he asked to be dropped off at Watson's house. Terrell told Johnson to return for him at 9:00 a.m. Johnson went back to the motel, slept until 8:30 a.m., and then drove back to pick up Terrell. Before 9:00 a.m., he had a conversation with the motel manager in the parking lot as he was leaving. The manager noticed that the broken glass in the parking lot was on the side of the car opposite the broken window, indicating that the Cadillac had been moved since the window was broken. The man with whom she spoke matched Johnson's description and she testified that he was alone.

Johnson drove back and forth on the road in front of Watson's house, stopping at a Wal-mart and a convenience store to wait. Witnesses saw Johnson driving Terrell's blue Cadillac at this time. Johnson testified that Terrell appeared near Watson's house and he stopped and picked him up. Watson's neighbor testified that at approximately 9:30 a.m., she saw a man wearing a white shirt standing next to a large blue car parked on the side of the road. Terrell was wearing a white shirt on June 22. Terrell told Johnson that he had shot a man. Terrell bought new clothes at a department store and took a bath at his grandmother's house while Johnson washed the car. Later, Terrell took his son to the zoo.

When questioned by the police, Terrell admitted committing the forgeries, but denied the murder. He said that he and Johnson had checked into the motel with a woman, who was never identified, and stayed there all night after he had locked his keys in the car. He said that they did not leave until 10:00 or 10:30 a.m., when they broke the window to get into the Cadillac. Later in the interview, a police officer asked him how the woman got home and Terrell stated that

Johnson drove her home early that morning, which would have been impossible if the keys were locked in the car at that time. When Terrell realized that he had contradicted himself, he refused to answer any more questions.

The evidence was sufficient to enable a rational trier of fact to find proof of Terrell's guilt of malice murder and ten counts of first-degree forgery beyond a reasonable doubt. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979). The evidence was also sufficient to authorize the jury to find beyond a reasonable doubt the statutory aggravating circumstances which supported his death sentence for the murder. *Jackson v. Virginia*, supra; OCGA § 17-10-35 (c) (2).

3. Contrary to Terrell's contention, we hold that the evidence corroborating Jermaine Johnson's testimony was sufficient to support his murder conviction. OCGA § 24-4-8. The corroborating evidence need not be sufficient by itself to convict Terrell, nor does the testimony of an accomplice need to be corroborated in every detail. See *Riley v. State*, 268 Ga. 640 (1) (491 SE2d 802) (1997); *Myers v. State*, 260 Ga. 412 (3) (395 SE2d 811) (1990); *Castell v. State*, 250 Ga. 776 (1) (c) (301 SE2d 234) (1983). " 'Slight evidence from an extraneous source identifying the accused as a participator in the criminal act will be sufficient corroboration of the accomplice to support a verdict. (Cits.)' " *Myers*, supra. Johnson's testimony was corroborated by evidence that Terrell had a motive to kill the victim in order to prevent the taking of an arrest warrant which would violate his parole conditions, that Terrell checked into a motel near the victim's house the night before the murder, that Terrell was wearing a white shirt on June 22 and a man in a white shirt was seen near the victim's house at the time of the murder, that two witnesses saw Johnson driving Terrell's car near the victim's house around the time of the murder, and that Terrell lied to the police about when the car window had been broken. See *Myers*, supra; *Pye v. State*, 269 Ga. 779 (5) (505 SE2d 4) (1998). The sufficiency of the corroborating evidence is a matter for the jury, and the evidence was legally sufficient for the jury to convict. *Edmond v. State*, 267 Ga. 285 (2) (476 SE2d 731) (1996); *Jackson v. Virginia*, supra.

4. Terrell's complaint about the jury charge on corroboration of accomplice testimony is without merit. The record shows that the charge given was virtually identical to the charge on accomplice testimony corroboration contained in the pattern jury instructions. *Edmond*, supra at (3); Council of Superior Court Judges of Georgia, Suggested Pattern Jury Instructions, Vol. II, pp. 52-53 (1991).

5. During a colloquy, Terrell's counsel announced that he intended to argue in closing that the State had something to hide. When asked what he meant by the State having something to hide,

defense counsel responded that the State did not do its job in this case. The trial court replied that the defense could argue that the State did not do its job, but that there was no evidence to support an argument of deliberate misconduct by the prosecution. Terrell was permitted to and did argue that the State did not do an adequate investigation in the case, that others had motives to kill the victim, and that State witnesses were not truthful and may have committed perjury. Terrell now asserts that the trial court improperly limited his closing argument. However, there was no evidence that the State was hiding something, and the trial court has discretion to determine the range of proper closing argument. *Morgan v. State*, 267 Ga. 203 (1) (476 SE2d 747) (1996). After review of the record, we cannot conclude that the trial court abused its discretion. See *Morgan v. State*, supra; *Manning v. State*, 207 Ga. App. 181 (4) (427 SE2d 521) (1993) (trial court did not abuse its discretion by preventing defendant from arguing that the State intentionally delayed his trial in order to cause witness memory lapses, when there was no evidence to support such a claim).

6. GBI agent Troy Pierce interviewed Terrell on June 22 and on June 24, 1992. Agent Pierce took handwritten notes during each interview, dictated the notes onto an audiotape, and had his secretary transcribe the notes. As was his standard practice, Agent Pierce checked the transcription against the original handwritten notes for accuracy, and then discarded the original notes. Terrell claims that the destruction of the original notes amounted to the destruction of evidence in violation of his due process rights and *Brady v. Maryland*, 373 U. S. 83 (83 SC 1194, 10 LE2d 215) (1963). There was no error. Assuming that the original notes were evidence, the record does not show that they were material or that Agent Pierce acted in bad faith. See *Arizona v. Youngblood*, 488 U. S. 51 (109 SC 333, 102 LE2d 281) (1988); *Walker v. State*, 264 Ga. 676 (3) (449 SE2d 845) (1994).

7. Terrell complains that the State improperly introduced evidence of his character in the guilt-innocence phase. OCGA § 24-2-2. To show motive for the murder, the trial court permitted the State to present evidence that Terrell was on parole at the time of the murder and that the taking of an arrest warrant for the forgeries would have resulted in his immediate incarceration for violating his parole conditions. The State did not present evidence in the guilt-innocence phase about the nature of his prior conviction. We find no error. "While motive is not an essential element in the proof of the crime of murder, the State is entitled to present evidence to establish that there was a motive." *Johnson v. State*, 260 Ga. 457 (2) (396 SE2d 888) (1990). Evidence that the victim's taking of an arrest warrant would have immediately returned Terrell to jail was relevant to prove that

Terrell had a motive to kill the victim, and relevant evidence is not rendered inadmissible simply because it incidentally puts the defendant's character in issue. *Cook v. State*, 221 Ga. App. 831 (3) (472 SE2d 686) (1996) (evidence that defendant was on parole relevant and admissible to show his motive for robbery).

8. Terrell's arrest was not illegal. The trial court correctly found that he was arrested pursuant to an outstanding warrant for terroristic threats or acts. OCGA § 17-4-20.

9. The record does not support Terrell's claim of bias on the part of the trial judge.

### *The Sentencing Phase of Trial*

10. Terrell argues that the trial court erred by refusing to admit relevant mitigating evidence in the sentencing phase. In an attempt to cause the jury to have "residual doubt," he sought to introduce evidence that he offered to plead guilty to the forgeries in exchange for consecutive sentences totaling 100 years, but that he refused to plead guilty to murder. While the permissible scope of mitigation evidence is wide, *Barnes v. State*, 269 Ga. 345 (27) (496 SE2d 674) (1998), the trial court correctly refused to admit this evidence. For policy reasons, evidence of a defendant's conditional offer to plead guilty is not admissible in the sentencing phase. *Mobley v. State*, 265 Ga. 292 (18) (455 SE2d 61) (1995).

11. "The trial court did not err in failing to instruct the jury that a unanimous finding on mitigating circumstances is not required, while charging the jury that its sentencing verdict had to be unanimous, since the court charged the jury that it was not necessary for the jury to find any mitigating circumstances to impose a life sentence." *McClain v. State*, 267 Ga. 378 (6) (477 SE2d 814) (1996). It was also not error for the trial court to refuse to instruct the jury on residual doubt. The trial court is not required to identify specific mitigating circumstances in its charge. *Jenkins v. State*, 269 Ga. 282 (25) (498 SE2d 502) (1998).

12. Evidence that Terrell set a fire in his jail cell while awaiting trial was properly admitted as a non-statutory aggravating circumstance. See *Hicks v. State*, 256 Ga. 715 (19) (352 SE2d 762) (1987) (a defendant's character and his conduct while in prison are relevant to sentence). The State provided sufficient pretrial notice of its intention to present evidence about this incident in accordance with OCGA § 17-10-2.

13. We need not address the remaining enumerations of error because they are not likely to recur on retrial. Since the evidence supports the jury's finding of the statutory aggravating circumstances, on retrial the State may again seek the death penalty. *Chil-*

*dress v. State*, 266 Ga. 425 (6) (467 SE2d 865) (1996); *Moore v. State*, 263 Ga. 11 (9) (427 SE2d 766) (1993).

*Judgments reversed. All the Justices concur, except Benham, C. J., who concurs in Divisions 1, 2, 3, 4, 5, 6, 7, 8, 9, 12, and 13 and in the judgment, and Hunstein, J., who dissents.*

HUNSTEIN, Justice, dissenting.

The majority holds that the trial court erred in refusing to strike juror Smith for principal cause based on its conclusion that juror Smith was a "full-time military policeman with arrest power [who] did not meet any of the exceptions to th[e] automatic disqualification rule." Majority Opinion at 783 (1). Because such a conclusion is not supported by the record and unjustifiably expands our holding in *Hutcheson v. State*, 246 Ga. 13 (1) (268 SE2d 643) (1980), I respectfully dissent.

This Court has recognized the importance of a citizen's right to participate in jury service in that it

> "affords ordinary citizens a valuable opportunity to participate in a process of government, an experience fostering, one hopes, a respect for law." [Cit.] Indeed, with the exception of voting, for most citizens the honor and privilege of jury duty is their most significant opportunity to participate in the democratic process.

*Lewis v. State*, 262 Ga. 679, 680 (424 SE2d 626) (1993), quoting *Powers v. Ohio*, 499 U. S. 400, 407 (111 SC 1364, 113 LE2d 411) (1991). Thus, as a general rule, we have not automatically deprived citizens of their right to sit as jurors unless a presumption of bias is clearly established. *Hutcheson*, supra at 14. In *Hutcheson*, we held that full-time police officers must be excused if challenged for principal cause because

> [i]t is inherent in the nature of police duties and the closeness with which such officers are identified with criminal procedures that questions regarding possible bias, fairness, prejudice or impermissible influence upon jury deliberations inevitably arise.

Id., 246 Ga. at 14 (1). Because the right to participate in jury service is so important, however, we have consistently refused to extend the rule in *Hutcheson* to persons less connected with law enforcement than full-time police officers or to those whose employment is not so closely identified with the case before the court or general criminal procedures "that questions regarding possible bias, fairness, prejudice or impermissible influence upon jury deliberations inevita-

bly arise." See id. Applying the rule of *Hutcheson*, we have refused to automatically and arbitrarily disqualify a sworn part-time police officer based on the limited nature of his duties, *Denison v. State*, 258 Ga. 690 (4) (373 SE2d 503) (1988), and have held that a full-time active-duty military police officer temporarily serving as a drill sergeant was not automatically disqualified based on the absence of evidence raising a suspicion that he was biased against the defendant. *Cargill v. State*, 255 Ga. 616 (6) (340 SE2d 891) (1986). We also have held that *Hutcheson* did not apply to a former part-time police officer who, at the time of trial, served as a reserve police officer called to duty when help was needed. *Wilson v. State*, 250 Ga. 630 (4) (a) (300 SE2d 640) (1983).

Although relying on *Denison*, *Cargill*, and *Wilson* to support its conclusion that juror Smith is automatically disqualified from jury service, the majority fails to distinguish these cases from the facts of this case. I find they cannot be distinguished. Under the law of this State, juror disqualification or bias must be affirmatively shown by the party seeking to strike the juror for cause. *Jordan v. State*, 247 Ga. 328, 339 (6) (276 SE2d 224) (1981). The only record evidence concerning juror Smith indicates he was employed full-time as a readiness officer for a military police unit with the National Guard; he has been called to active duty on six occasions in the past seven years for flood control and weather emergency situations; and either he or others within his National Guard unit possess the power to arrest while maintaining military law and order. Based on the record evidence, there is nothing to suggest either that Smith's rare deployments to establish military law and order or his routine duties as a readiness officer, which were not explored on the record, raise inevitable questions of bias, prejudice, or undue influence upon jury deliberations.[2] See *Hutcheson*, supra at 14. Indeed, the sparse record evidence in this case indicates that juror Smith's military law enforcement duties were even more limited in nature and substantially less frequent than the jurors we held not to be automatically disqualified in *Denison*, supra, *Cargill*, supra, and *Wilson*, supra. Accordingly, I would find that Terrell failed to satisfy his burden of

---

[2] During a less than thorough voir dire, juror Smith was asked about his service with the National Guard. He responded that he had been in the Guard for fourteen years and had been called to active duty for flood control and similar projects on six occasions over the last seven years. In the only other question pertaining to his service in the National Guard he was asked, "Have you ever worked in your capacity with the Military Police in a military jail setting?" He responded, "See when we do an arrest, we're combating things, military law and order, we do imprisonment and a lot of times works with the jail, and also we do air security and station patrol." At no time was juror Smith asked about his full-time duties as a readiness officer, whether he himself had arrest powers, or whether he thought he could be fair and impartial in deciding the case.

establishing that juror Smith was subject to automatic disqualification based on his employment with the National Guard.[3]

The majority has failed to justify its decision to deprive juror Smith of his right not to be excluded from a jury on account of his National Guard duties. See *Lewis,* supra. The record uncontrovertedly shows no evidence of actual bias by juror Smith and neither case law nor the facts of this particular case supports the majority's expansion of *Hutcheson* so as to manufacture a presumption of bias on the part of a National Guard readiness officer called to temporary active duty only six times over the past seven years. Therefore, because the trial court did not err by refusing to strike juror Smith for principal cause, I would affirm that ruling and thus must respectfully dissent to the majority's reversal of the judgment in this case.

DECIDED NOVEMBER 1, 1999 —
RECONSIDERATION DENIED DECEMBER 17, 1999.

*Strauss & Walker, John T. Strauss, Tanya Greene,* for appellant.
*Alan A. Cook, District Attorney, Thurbert E. Baker, Attorney General, Susan V. Boleyn, Senior Assistant Attorney General, Paige R. Whitaker, Assistant Attorney General,* for appellee.

---

[3] Of course, had Terrell asked questions of juror Smith during voir dire which exposed any bias or prejudice, juror Smith would have been subject to a challenge for cause. See *Jordan v. State,* 247 Ga. at 338.