## A00A1168. JOHNSON v. THE STATE.
### (534 SE2d 480)

ELDRIDGE, Judge.

Appellant Jason Wayne Johnson and his cousin, Jerry Lee Lancaster, committed a home invasion wherein they donned Halloween masks, approached the home of the 70-year-old victim (their longtime neighbor), kicked in her front door, held a knife to her throat, took her purse, forced her into her kitchen, and took the money she had saved and hidden under a cereal box in her bottom kitchen cabinet. A Forsyth County jury found Johnson guilty of armed robbery, burglary, kidnapping with bodily injury, simple battery, false imprisonment, and possession of a knife during the commission of a crime. Johnson appeals.[1] We affirm.

Recitation of the following facts is necessary for disposition of the issues raised on appeal: the armed robbery of the victim occurred on March 2, 1997. Co-defendant Lancaster was arrested four days later on March 6, 1997. That same day, Lancaster gave a confession to the police, admitting that he and Johnson robbed the victim and split the money between them. In his statement, Lancaster told the police in detail how the robbery occurred; where he and Johnson found the masks and knives; how they forced the victim into the kitchen; where they found her money; and how they each spent the money. Lancaster admitted that he threatened to kill the victim if she did not show them where her money was hidden. Thereafter, he helped the police find the two masks and one of the knives used during the robbery, as well as the victim's purse that he and Johnson had thrown into a shallow pond. Lancaster told the police that he was a drug addict and had committed the robbery to get money for drugs; that the robbery was his idea, not Johnson's; that he kicked the victim's door open, not Johnson; that he held the knife to the victim's throat and threatened her, not Johnson; and that his confession was the "least I can do for [the victim]," who had taken care of his mother when she died.

Following his March 6, 1997 arrest for the instant armed robbery, Lancaster was incarcerated in the Forsyth County Detention Center ("jail"). After Lancaster had been incarcerated several months, Deputy Sheriff B. H. began working at the jail. B. H. and Lancaster began a drug and cigarette smuggling operation in the jail. Lancaster would collect money from inmates for drugs and/or cigarettes, and contact would be made with drug dealers on the outside to fill the orders. B. H. would get the money from Lancaster, obtain the drugs from the dealers, and bring the drugs into the jail for distribu-

---

[1] Lancaster is not before this Court.

tion by Lancaster to the waiting inmates. According to Lancaster, "[t]he first couple of weeks that we started doing it everything was going good you know. And then he started slacking up on giving me my cut out of it." When B. H. started shorting Lancaster on the drugs ordered by the inmates — drugs for which they had already paid — the "business" soured. Lancaster began to receive death threats from inmates and was involved in several fights. By July 20, 1997, after a particularly severe beating, Lancaster decided to tell all. He approached the Officer-in-Charge ("OIC") of the night shift at the jail and gave a detailed statement regarding the drug activities therein. Lancaster asked to be given a drug test to verify the presence of drugs in the jail; he tested positive for marijuana and barbiturates. The OIC gave all the information to his Captain. The Captain interviewed Lancaster the next day, July 21, 1997, and tape recorded his statement. Following the interview, Deputy B. H. abruptly "resigned." At his own request, Lancaster was transferred to a different jail for his protection.

Eight months later, on March 3, 1998, Lancaster pled guilty under the instant indictment to armed robbery, burglary, kidnapping, and possession of a knife during the commission of a crime. Pursuant to plea negotiations, which had been ongoing throughout his incarceration, Lancaster was sentenced to 35 years imprisonment, to serve 15, and the balance probated. At the time of the plea, Lancaster also had outstanding charges of escape, forgery, and burglary in Hall County.

Appellant Johnson pled "not guilty" and went to trial on September 22, 1998 — six months after Lancaster pled guilty and began serving time on his sentence and more than a year after Lancaster blew the whistle on the drug smuggling activity in the Forsyth County jail. At Johnson's trial, Lancaster was called as a witness for the State. His testimony mirrored the statement he gave to the police on the day of his arrest regarding his and Johnson's armed robbery of the victim. Also, during the course of both direct and cross-examinations, Lancaster testified regarding his negotiated guilty plea and sentence to the instant charges. He testified that there was no "deal" with the State for his testimony. He testified to his pending charges in Hall County. He testified to his three prior convictions for motor vehicle theft, forgery, and abandonment. Lancaster also testified that, at one point during his incarceration, he had briefly changed his story about Johnson's participation in the armed robbery because he was "torn between my family," and because Johnson's mother had begged him "[d]on't take my baby boy away from me"; shortly thereafter (long before trial), Lancaster determined it would be better to "do the right thing" and admit that the original statement he gave to the police was the truth of the matter. Lancaster also

volunteered the following testimony on direct examination: "I got mixed up in some stuff while I was at the county jail. I got involved with a deputy there and he was bringing me drugs and I was turning around and selling them."

During defense counsel's lengthy cross-examination of Lancaster, the subject of drug sales at the Forsyth County jail was not broached. When court recessed for the night, defense counsel "made occasion to go down to the jail last night and [Lancaster] has spilled his entire guts on the issue." When court reconvened the next day, the State rested. Thereafter, defense counsel made motion to recall Lancaster in order to cross-examine him regarding the entire drug selling scheme at the jail. Defense counsel proffered that Lancaster had been threatened with increased jail time on his current sentence if he spoke to anyone about the drug selling scheme at the jail; defense counsel argued that this evidence showed that Lancaster was "terrified" of law enforcement, which in turned showed why Lancaster testified for the prosecution and thus "lied" about Johnson's participation in the armed robbery. The State made a motion in limine with regard to this evidence, claiming it had no relevance to the trial of the instant case. The trial court agreed and granted the State's motion, finding:

> Based on what's been presented to me, I find that the proposed subject matter of the examination, that there's minimal, if any, relevance to the issue which this Court has been convened to try. And while they are matters that need attention in other arenas, it is not in the course of trying this case. I think, in addition, that whatever minimal relevance, if any, there is, is substantially outweighed by the prejudice that the entry into this area would involve, we're going to try this case; not try other problems that may exist in the law enforcement arena of Forsyth County.

The jury convicted Johnson as charged, and he filed a motion for new trial raising, inter alia, the issue regarding Lancaster's involvement in drug sales at the jail, as well as an alleged *Brady*[2] violation. At the hearing on the motion, Johnson called the deputy who transported Lancaster to and from the jail during trial. The deputy testified that, mid-trial, he informed the prosecutor that Lancaster was the inmate who had been involved in selling drugs at the jail; he testified that the prosecutor instructed him not to tell defense counsel.[3]

---

[2] *Brady v. Maryland*, 373 U. S. 83 (83 SC 1194, 10 LE2d 215) (1963).

[3] The prosecutor did not deny giving such instruction but asserted no recollection of the conversation with the deputy.

At the hearing, Johnson also called Lancaster to the stand. Lancaster testified in detail as to his participation in the drug smuggling scheme at the jail. Johnson, however, never stated that his trial testimony was in exchange for any "deal" with law enforcement; he never stated that his testimony was in anyway colored by "terror" of law enforcement; and he never stated that his testimony regarding Johnson's participation in the armed robbery of the victim was in anyway untrue. Notably, defense counsel did not ask those questions or pursue such line of inquiry, although that was the basis for the proffer of Lancaster's testimony during trial. Instead, the defense argued at the motion for new trial that neither Lancaster nor B. H. was prosecuted for drug activities at the jail because of a law enforcement effort to "cover up" the incident and that such evidence should have been admitted at trial as valuable impeachment evidence.

After hearing evidence and argument of counsel, the trial court reaffirmed its prior ruling and found that the drug sale evidence was irrelevant to the issues on trial. The court also found that, during trial, defense counsel learned far more about Lancaster and his involvement in the drug smuggling scheme than the prosecutor had and, thus, no evidence was "withheld" from him as contemplated by *Brady*. The trial court denied the motion for new trial. *Held*:

1. Evidence of Lancaster's involvement in drug sales at the jail went before the jury. However, Johnson contends that the trial court erred in granting the State's motion in limine as to further cross-examination on Lancaster's involvement in the drug sales. Johnson contends that such ruling denied him a thorough and sifting cross-examination on material impeachment evidence. He claims, based on *Davis v. Alaska*, 415 U. S. 308, 316 (94 SC 1105, 39 LE2d 347) (1974), as interpreted in *Hines v. State*, 249 Ga. 257, 259-260 (2) (290 SE2d 911) (1982), that such evidence was relevant to show the possibility of bias in favor of the prosecution, as well as Lancaster's motivation for testifying, i.e., to curry favor with the prosecution. We disagree.

A criminal defendant has the right to cross-examine a witness concerning *pending* criminal charges against the witness in order to expose a witness' motivation in testifying, e.g., bias, partiality, or agreement between the government and the witness. *Davis v. Alaska*, supra at 316-317; *Hines v. State*, supra at 259-260. At the same time, the extent of cross-examination is within the sound discretion of the trial court. *Kennebrew v. State*, 267 Ga. 400, 402-403 (3) (480 SE2d 1) (1996).

> The bias . . . of *Davis v. Alaska*, supra, must be specific to the case, arising from a self-interest or self-preservation motive that could be reasonably inferred to cause testimony to be shaded or distorted. . . . [A] generalized attitude

would not satisfy such interest of the witness, especially when such attitude arises after the fact. Absent such foundational facts such as a pending criminal charge about which the witness seeks assistance from the prosecution, there can be no cross-examination on such subject, because a dismissed charge or an old conviction could not be the basis of a motive to shade or distort testimony.

(Citation omitted.) *Farley v. State*, 225 Ga. App. 687, 690 (484 SE2d 711) (1997). Further, where an appellant fails to prove either that there had been a deal or that a witness has any hope of a deal, it is not error for the trial court to refuse to allow appellant to attempt to impeach the witness with impermissible character evidence. *Wright v. State*, 266 Ga. 887, 889 (471 SE2d 883) (1996); *Mulkey v. State*, 250 Ga. 444, 446 (298 SE2d 487) (1983).

(a) Here, it is uncontroverted that Lancaster has not been arrested for and has no pending charges related to drug sales at the jail. Absent *pending* charges, the jail scheme provides no basis by which "the partiality of [Lancaster] may be exposed by proof that he hopes to benefit in related cases from his cooperation with the prosecution in this case." *Kinsman v. State*, 259 Ga. 89, 91 (376 SE2d 845) (1989). To allow defense counsel to cross-examine Lancaster on specific instances of bad conduct at the jail is a prohibited form of impeachment. OCGA § 24-9-84. "If appellant wished to impeach [Lancaster] with proof of [his] bad character, the introduction of evidence of specific acts was not the proper method of doing so." (Citations and punctuation omitted.) *Kennard v. State*, 180 Ga. App. 522 (1) (349 SE2d 470) (1986).

(b) The evidence shows that many months before Lancaster became involved in drug sales at the jail, he decided to cooperate with the prosecution of this case and gave a detailed statement to the police regarding his and Johnson's armed robbery of the victim. Lancaster's trial testimony mirrored that statement without deviation. Thus, the substance of his trial testimony was not connected with the drug sales; it was established long before, and one did not "shade" the other.

(c) The jail scheme evidence was not relevant on the trial of the instant case. We agree with the trial court's well-reasoned conclusion that defense counsel's evidence showed egregious incidents of abuse at the jail. And by this opinion, we in no way intend to minimize the seriousness of such abuses. However, counsel failed to create a nexus between the jail scheme and *this* case so as to form a basis for impeaching Lancaster's testimony regarding Johnson's participation in the armed robbery. The drug sales evidence did not prove or disprove the substance of the charges against Johnson; such evidence

did not demonstrate conviction of a crime of moral turpitude so as to impeach Lancaster; and such evidence did not demonstrate either (i) the feelings between Lancaster and Johnson or (ii) the possibility of an attempt by Lancaster to curry favor with the district attorney in relation to pending charges, so as to discredit his testimony through bias and/or prejudice.

In support of his contention, Johnson argues that (i) Lancaster was threatened with an increased amount of service time on his current sentence if he spoke to anyone about the jail scheme, and (ii) he received benefits in jail as long as he did not mention the jail scheme. However, his argument misses the point. Regardless of the validity of these assertions, there is no evidence of a nexus between such threats or benefits, which were allegedly given in exchange for silence about the *jail scheme*, and Lancaster's testimony about *Johnson* and the armed robbery so as to impact on the truth of such testimony. And, in any event, Lancaster willingly told the Sheriff's Department what happened at the jail; he volunteered to the jury that he had participated in illegal drug sales at the jail; he told defense counsel what happened at the jail; he told the transporting officer the name of the deputy who had helped him sell drugs at the jail; and he told the trial court on motion for new trial what happened at the jail. Lancaster's obvious willingness to break his silence about the jail scheme negates the inference that prior threats or benefits might have influenced him in any way.

Evidence of Lancaster's involvement in drug sales at the jail was before the jury. The trial court simply disallowed further testimony concerning it. Because such further evidence had neither exculpatory nor proper impeachment value, "we find that the trial court did not abuse its discretion by granting the State's motion in limine." *Stewart v. State*, 210 Ga. App. 474, 476 (6) (436 SE2d 679) (1993).

2. "A *Brady* violation does not exist where the information sought by the defendant becomes available at trial. [Cit.]" *Jenkins v. State*, 269 Ga. 282, 292 (18) (498 SE2d 502) (1998); *Knight v. State*, 271 Ga. 557, 560 (521 SE2d 819) (1999). Here, contrary to Johnson's contentions, there was no *Brady* violation. The trial court correctly determined that the "evidence about which [Johnson] complains came out during trial, thereby rendering his *Brady* challenge meritless." *Thomas v. State*, 239 Ga. App. 460, 461 (2) (c) (521 SE2d 397) (1999).

Further, our decision in Division 1, supra, renders the instant enumeration of error meritless, since the evidence cannot meet the materiality prong of *Brady*.[4] See *Walker v. State*, 264 Ga. 79, 80-81 (4)

---

[4] To the extent that the instant enumeration of error also contains a claim under *Giglio*

(440 SE2d 637) (1994); *Smith v. State*, 234 Ga. App. 586, 591 (506 SE2d 406) (1998).

Although reversal is not warranted, we find troubling the prosecutor's conduct in specifically instructing the transporting deputy, "don't tell Jim [defense counsel]" about Lancaster's participation in drug sales at the jail. The prosecutor's conduct may have had no more nefarious a motivation than desire to avoid the protracted arguments the issue ultimately engendered (and by such conduct, more weight may have been given to the issue than full disclosure would have caused). However, an appearance of impropriety exists here, and we specifically disapprove the prosecutor's conduct.

3. Under Georgia law, Johnson may not be convicted on the uncorroborated testimony of Lancaster, an accomplice. OCGA § 24-4-8. Accordingly, Johnson challenges the sufficiency of the independent corroborating evidence introduced against him.

> The corroboration must be independent of the accomplice's testimony and it must connect the defendant to the crime or lead to the inference that he is guilty. However, the corroborating evidence need not of itself be sufficient to warrant a conviction of the crime charged. Slight evidence from an extraneous source identifying the accused as a participant in the criminal act is sufficient corroboration of the accomplice to support a verdict. The corroborating evidence may be circumstantial.

(Citations and punctuation omitted.) *Short v. State*, 234 Ga. App. 633, 635 (507 SE2d 514) (1998).

In this case, consistent with Lancaster's testimony, Johnson's sister-in-law, Virginia Blackwell, gave a statement to the police in which she stated that Lancaster and Johnson were very close to each other and were always together; she stated that, approximately a week before the robbery, Johnson helped Lancaster escape from the Hall County Diversion Center and they both came to stay with Blackwell and their half-brother, her husband Billy Blackwell.[5] Vir-

---

*v. United States*, 405 U. S. 150 (92 SC 763, 31 LE2d 104) (1972), that Lancaster received a "deal"/reduced sentence in exchange for his testimony against Johnson, such issue was explored on cross-examination. Lancaster testified that there was no deal. His trial testimony did not differ from his original statement to the police, given well before plea negotiations with the State. See *McWhorter v. State*, 271 Ga. 461, 462 (3) (519 SE2d 903) (1999). Further, Lancaster had already begun serving his sentence on the indictment at the time of Johnson's trial, and the State could not resentence him thereon depending on the favorability of his testimony; this fact further undermines the notion that Lancaster's sentence was contingent upon his trial testimony.

[5] At trial, Blackwell contradicted almost the entire statement she had previously given to the police. However, "a prior inconsistent statement of a witness who takes the stand and

ginia Blackwell stated that neither man held a job.

Blackwell also stated that Lancaster and Johnson had plans to be together on the night of the robbery, March 2, 1997, and that Lancaster told her that "I've got to go. I've got to meet Jason [Johnson]." Blackwell stated that she went to the store at 7:00 p.m. and when she returned, Lancaster had gone to meet Johnson.

The victim testified that the robbery was committed by two men at approximately 10:00 p.m. on March 2, 1997. Blackwell stated that Lancaster and Johnson returned to her house together at approximately 2:00 a.m.,[6] and Lancaster immediately paid Billy Blackwell $40 that he owed to him. At 6:30 a.m., when Virginia Blackwell awoke, she found Lancaster and Johnson asleep in her children's bedroom.

In addition, Lancaster testified that he and Johnson split the money from the armed robbery of the victim and that Johnson had gone shopping the next day with his sister, Felicia Johnson, and spent his share of the robbery money on clothes. Felicia Johnson confirmed that the day after the robbery, Johnson bought a pair of blue jeans, two shirts, and a pair of black Everlast tennis shoes.[7] These items were recovered from Johnson's brother's house; their date of purchase was confirmed by the respective stores in which they were bought. Lancaster also stated that Johnson spent the robbery money on lunch with Felicia Johnson and on a haircut. Felicia Johnson confirmed that Johnson bought them lobster tail for lunch and had a haircut thereafter.

The evidence showed that several days later, Lancaster and Johnson were arrested together at Johnson's mother's house. Johnson had been asleep on the couch. When the police arrived at the residence, Johnson's mother told them "she had not seen Jerry Lancaster in over a year; didn't have any idea where he was." Lancaster was hiding in the attic.

> The sufficiency of the corroboration evidence is peculiarly a matter for the jury to determine. If the verdict is founded on slight evidence of corroboration connecting a defendant with the crime, the verdict is legally sufficient. The necessary corroboration may consist entirely of circumstantial evidence, and evidence of the defendant's conduct before and after the

---

is subject to cross-examination is admissible as substantive evidence." *Gibbons v. State*, 248 Ga. 858, 862 (286 SE2d 717) (1982).

[6] Lancaster testified that, after the robbery, he and Johnson spent time running from the law and getting rid of evidence.

[7] The trial testimony of Felicia Johnson also contradicted much of the statement she had previously given to the police. But see footnote 5, supra.

crime was committed may give rise to an inference that he participated in the crime.

(Citations and punctuation omitted.) *Bradford v. State*, 262 Ga. 512, 513 (421 SE2d 523) (1992).

In the present case, independent evidence (a) that Johnson helped Lancaster escape from the diversion center and they stayed together thereafter; (b) that the armed robbery was committed by two men; (c) that Johnson was with Lancaster immediately before the armed robbery and arrived at home with him after the armed robbery; (d) that following the armed robbery, the unemployed Johnson was in possession of money; and (e) that Johnson continued to stay with Lancaster up to their arrest provides sufficient independent corroborating evidence to uphold the jury's determination that it was Johnson who aided Lancaster during the armed robbery of the victim in the instant case. *Bradford v. State*, supra; *Edmond v. State*, 267 Ga. 285, 287 (476 SE2d 731) (1996).

4. We have reviewed Johnson's remaining enumeration of error and find it to be a restatement of the prior claims of error. Accordingly, we find it meritless.

*Judgment affirmed. Blackburn, P. J., and Barnes, J., concur.*

DECIDED MAY 3, 2000 —
RECONSIDERATION DISMISSED MAY 22, 2000.

*James E. Hardy II,* for appellant.
*Philip C. Smith, District Attorney, Jennifer L. Pirrung, Assistant District Attorney,* for appellee.