### A08A0265. GRIMES v. THE STATE.
(662 SE2d 346)

MIKELL, Judge.

Following a jury trial, Timothy Grimes was convicted of four counts of robbery. On appeal, Grimes contends, among other things, that he received ineffective assistance of counsel because his trial counsel failed to object to inadmissible testimony identifying Grimes as the man depicted in photographs derived from bank security videotapes. We agree and reverse.

> On appeal from a criminal conviction, the evidence is construed in the light most favorable to the verdict of guilt, and the presumption of innocence no longer applies. As an appellate court, we do not weigh the evidence, judge the credibility of witnesses, or resolve conflicts in trial testimony when the sufficiency of the evidence is challenged. Instead, we determine if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.[1]

So viewed, the evidence shows that during 2004 and 2005, six DeKalb County bank tellers were robbed by persons who displayed a

---

[1] (Punctuation and footnotes omitted.) *Mann v. State*, 244 Ga. App. 756, 757 (1) (536 SE2d 608) (2000).

note or card with the word "holdup." The six robberies occurred on August 23, 2004, May 4, 2005, May 16, 2005, May 20, 2005, May 31, 2005, and June 13, 2005, and Grimes was indicted for and convicted of the crimes that took place on August 23, 2004, May 4, 2005, May 20, 2005, and May 31, 2005. For clarity, we recount them all in chronological order.

*August 23, 2004*

On August 23, 2004, a man approached a teller working at a SunTrust Bank located in a Publix grocery store on Hugh Howell Road in DeKalb County. The man held up a note that read "holdup," and he told the teller, "you have five seconds." The teller gave the man approximately $3,239. Afterward, the teller described the perpetrator to police as a clean-shaven, short-haired black male, six-feet two-inches tall, approximately 220 to 240 pounds. The teller reviewed five photographs derived from bank surveillance videotapes, and he confirmed that they were a fair and accurate representation of what had happened. Another bank employee saw the robber, whom she also described to police as an African-American approximately six-feet two-inches tall.

*May 4, 2005*

On May 4, 2005, at the same SunTrust Bank branch, a man walked up to a service representative and showed her a notebook which had "holdup" written on it. He told her not to give him the "dye pack," and she gave him the money from the top drawer of the register, without the dye pack, and then triggered the alarm. The representative described the man to police as a black male, approximately six-feet two-inches tall, whose beard was growing in "a little bit," and who had a gap in his two front teeth. The witness confirmed that seven photographs taken from the bank surveillance videotapes were a fair and accurate representation of what happened.

*May 16, 2005*

A teller at another SunTrust Bank branch located within a Publix was robbed on May 16, 2005. A man approached the teller and flashed a note card which read "holdup." She gave the man the money out of the cash register. The teller later identified the perpetrator, Alphonso Holmes, in a lineup. She confirmed at trial that Grimes was not the person who robbed the bank.

*May 20, 2005*

The Wachovia Bank branch located on Flat Shoals Parkway in Decatur was robbed on May 20, 2005. The teller looked up from finishing a customer's deposit and standing in front of her was a man holding up an index card with the word "holdup." After he refused to accept any $10 bills, the teller handed him all the $20 bills that

were in the drawer, and he walked out the door. She described the robber to police as a heavy-set black male, six feet tall, with gray specks in his hair, and an unshaved beard. She identified Grimes as the perpetrator in a photographic lineup. She indicated on the identification form that her identification was "tentative" because "I wasn't really sure." The witness explained, "I was more . . . 85 percent sure than 100 percent sure." The witness was not asked to make an in-court identification, although she identified three photographs derived from bank surveillance video as a fair and accurate representation of what had occurred.

*May 31, 2005*

On May 31, 2005, a man robbed another Wachovia Bank branch. He approached the teller's window and displayed a piece of paper which read, "this is a holdup." She gave him the money from her drawer, and he left. The teller later identified the perpetrator, Wayne Stern, in a photographic lineup.

*June 13, 2005*

On June 13, 2005, Stern returned to the Wachovia Bank he had robbed two weeks earlier. The teller recognized him, and notified her manager, who walked up to Stern and asked him several times if she could help him. Stern left the bank, and the teller saw him get into the passenger's seat of an old Lincoln model car, and he and the driver drove away.

That same day Stern robbed the SunTrust Bank branch which had previously been robbed on August 23, 2004, and May 4, 2005. Stern walked up to the teller and showed her a note with the word "holdup." He asked for five large bills, and when the teller held up four $50 bills, he took the money and ran.

Grimes was indicted for the robberies occurring on August 23, 2004, May 4, 2005, and May 20, 2005. Holmes was indicted for the robbery occurring on May 16, 2005. Grimes, Holmes, and Stern were indicted for the May 31, 2005, robbery. Holmes and Stern were indicted for the June 13, 2005, robbery. Holmes and Stern pled guilty to the charged crimes.

The state called Stern to testify at Grimes's trial. According to Stern, he was introduced by Holmes to Grimes about two months before Stern became involved in the bank robberies. Stern admitted to committing the May 31, 2005, robbery and the June 13, 2005, robbery. According to Stern, Holmes and Grimes picked him up in Holmes's Lincoln Town Car on the morning of May 31, 2005. Grimes was sitting in the passenger seat. Holmes gave Stern a note with "holdup" written on it and told him to show the note to the teller. Grimes "nodded like he was confirming everything." After the robbery, Stern drove Holmes's car to a Sam's Club where Grimes had parked his car. Holmes took the money from the robbery and went

toward Grimes's car, and then came back and handed Stern $3,000. According to Stern, only he and Holmes were involved in the June 13, 2005, robbery. Stern denied knowledge of any robberies before May 31, 2005, although he had seen "my codefendants with money and they didn't have jobs. Until it was my time to go in the bank, that's when I found out what happened and how they was getting money." Stern examined the photographic exhibits admitted in connection with the August 23, 2004, May 4, 2005, and May 20, 2005, robberies and, without objection, identified Grimes as the person depicted in the photographs.

The state also called Holmes as a witness. According to Holmes, he met Grimes "a couple months" before Holmes was arrested. Holmes maintained that he was involved in the bank robberies before he met Grimes, and that Grimes did not know about the robberies. He testified that Grimes had tattoos on his neck and his hands or forearms, and he identified several photographs as accurate depictions of Grimes's tattoos.

1. Grimes claims that there was insufficient evidence to support his conviction for the May 31, 2005, robbery. He argues that the only evidence linking him to this crime was Stern's testimony, but that Stern's testimony was not corroborated and so could not serve as a lawful basis for his conviction. We disagree.

OCGA § 24-4-8 provides in relevant part:

> The testimony of a single witness is generally sufficient to establish a fact. However, in certain cases, including . . . felony cases where the only witness is an accomplice, the testimony of a single witness is not sufficient. Nevertheless, corroborating circumstances may dispense with the necessity for the testimony of a second witness.

"Slight evidence of a defendant's identity and participation from an extraneous source is all that is required to corroborate the accomplice's testimony and thus support the verdict."[2] "[T]hat evidence may be entirely circumstantial."[3] If there is slight evidence of corroboration, the sufficiency of corroboration "is peculiarly a matter for the jury."[4]

Holmes confirmed that there were three people who went to the bank on May 31, 2005, although he maintained the third person was

---

[2] (Citation and punctuation omitted.) *Palmer v. State*, 286 Ga. App. 751, 753 (1) (650 SE2d 255) (2007).

[3] (Citation and punctuation omitted.) *Gibson v. State*, 267 Ga. App. 473, 474 (1) (600 SE2d 417) (2004).

[4] (Citation and punctuation omitted.) *Mosier v. State*, 223 Ga. App. 75, 76 (476 SE2d 842) (1996).

not Grimes but a man known only as "D." However, Holmes also testified that he pled guilty to the count of the indictment charging "you, Mr. Grimes, and Mr. Stern with the robbery on May 31st of 2005." "The testimony of one accomplice can corroborate that of another."[5] The connection between Holmes, Grimes, and Stern was also independently confirmed by an officer who responded to a two-car traffic accident on June 8, 2005. Stern, Holmes, and Grimes were together in one of the vehicles. Extraneous evidence also connected Grimes to at least one robbery in which he employed the same modus operandi as Stern employed in the May 31, 2005, robbery.[6] Accordingly, there is at least slight evidence from sources extraneous to Stern as to Grimes's identity and participation in that robbery, and the evidence was sufficient to support the guilty verdict on that count.

2. Grimes also maintains that his trial counsel provided ineffective assistance by failing to object to witness testimony identifying Grimes as the man depicted in the photographs derived from the bank security videotapes. We agree.

In reviewing a claim of ineffective assistance,

> the critical factual inquiry ordinarily relates to whether the defendant had a defense which was not presented; whether trial counsel consulted sufficiently with the accused, and adequately investigated the facts and the law; and whether the omissions charged to trial counsel resulted from inadequate preparation rather than from unwise choices of trial tactics and strategy. Generally, the burden is on the defendant claiming ineffectiveness of counsel to establish (1) his attorney's representation in specified instances fell below an objective standard of reasonableness and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. The trial court's determination that an accused has not been denied effective assistance of counsel will be affirmed on appeal unless that determination is clearly erroneous.[7]

---

[5] (Footnote omitted.) *Parkerson v. State*, 265 Ga. 438, 439 (2) (457 SE2d 667) (1995).

[6] *McConnell v. State*, 166 Ga. App. 530, 531-532 (2) (304 SE2d 733) (1983) (modus operandi of a series of burglaries considered as part of extraneous evidence corroborating accomplice's testimony).

[7] (Citations, punctuation and emphasis omitted.) *Johnson v. State*, 214 Ga. App. 77-78 (1) (447 SE2d 74) (1994) (whole court).

A detective who investigated the case testified that "when I came in contact with Mr. Grimes, having already seen the FBI bulletin,[8] it was apparent that this was the individual from those cases." Stern testified that, after having reviewed the photographs of the persons derived from bank surveillance videos of the August 23, 2004, May 4, 2005, and May 20, 2005, robberies that "there's no doubt in my mind that that is Timothy Grimes." In his amended motion for new trial, Grimes claimed that his trial counsel was ineffective in failing to object to this testimony because it was inadmissible opinion evidence regarding the identity of the person depicted in the bank surveillance videotapes.

At the hearing on the motion for new trial, Grimes's trial counsel testified that he did not make the objection to either Stern's or the investigator's identification testimony because he believed the testimony was permissible. If trial counsel was correct in his assessment, his "[f]ailure to make a meritless objection cannot be evidence of ineffective assistance."[9] However, an objection to Stern's and the investigator's identification testimony would have had merit.

> [J]urors are the ultimate finders of fact, and where it is possible for them to take the same elements and constituent factors which guide the expert to his conclusions and from them alone make an equally intelligent judgment of their own, independently of the opinion of others, then undoubtedly this should be done.[10]

"It thus remains improper to allow a witness to testify as to the identity of a person in a video or photograph when such opinion evidence tends only to establish a fact which average jurors could decide thinking for themselves and drawing their own conclusions."[11]

> [A] lay witness's testimony concerning an identification should be admitted for the jury's consideration *only* if there is some basis for concluding that the witness is more likely to correctly identify the defendant from the photograph than is the jury, as when the witness is familiar with the defendant's appearance around the time a surveillance

---

[8] The FBI bulletin contained photographs derived from the bank security videos.

[9] (Citation and punctuation omitted.) *Fults v. State*, 274 Ga. 82, 87 (7) (548 SE2d 315) (2001).

[10] (Citation and punctuation omitted.) *Carter v. State*, 266 Ga. App. 691, 692-693 (2) (598 SE2d 76) (2004) (whole court).

[11] (Punctuation and footnote omitted.) *Mitchell v. State*, 283 Ga. App. 456, 458-459 (641 SE2d 674) (2007).

photograph was taken and the defendant's appearance has changed prior to trial, or when the witness knows about some other distinctive but presently inaccessible characteristic of the defendant's appearance.[12]

There was no evidence that the defendant's appearance had changed prior to trial, and the state does not argue otherwise.[13] The state contends, however, that because the perpetrator's head is covered in the photographs, and that because "the photographs are grainy, making it difficult to see the robber's features clearly," that a person who knew Grimes could make a more accurate identification from the photographs than could the jury, and that Stern's identification testimony, in particular, was therefore admissible. However, a witness's familiarity with the defendant, in and of itself, does not make his or her identification testimony based on a video or photograph admissible.[14] Otherwise, "[s]uch practice would open floodgates of witnesses for both sides who would give their opinion as to the identity of the person in the video."[15] Unlike the defendant's friend of 22 years whose identification opinion testimony our Supreme Court found to be admissible in *Dawson v. State*,[16] Stern did not testify that Grimes's appearance had changed between the time of the video recordings and trial, or that the profile, hand gestures, posture, or demeanor depicted by the person in the photographs brought Grimes to mind.[17]

In ruling on the motion for new trial, the trial court concluded that Stern was better able to identify Grimes in light of his knowledge of a "distinctive but presently inaccessible characteristic of the defendant's appearance."[18] Specifically, the trial court found that Grimes had a heart tattoo on his arm about which Stern would

---

[12] (Punctuation and footnotes omitted; emphasis in original.) Id. at 457-458.

[13] Compare *Roberts v. State*, 257 Ga. App. 251, 252 (2) (570 SE2d 595) (2002) (officers who testified had observed defendant only four days after the robbery and noticed that his appearance had changed by the time of trial); *Harper v. State*, 213 Ga. App. 444, 448 (5) (445 SE2d 303) (1994) (unlike jury, investigators were able to observe the defendant at the time of the robbery before his appearance had changed).

[14] *Carter*, supra (superior court properly excluded lay opinion testimony to the effect that defendant was not one of the perpetrators depicted in the videotape of the crime scene); *Mitchell*, supra at 459 (trial court abused its discretion in allowing a police officer, based on his previous acquaintance with the defendant, to identify him as the person shown in the surveillance photographs).

[15] *Carter*, supra at 693 (2).

[16] *Dawson v. State*, 283 Ga. 315 (658 SE2d 755) (2008).

[17] Id. at 319 (4).

[18] *Mitchell*, supra at 458.

have known,[19] and that the tattoo was visible on at least one of the surveillance photographs. However, multiple, close-up photographs of Grimes's tattoos, including the heart-shaped tattoo on his arm, were introduced by the defense prior to Stern's testimony. Thus, while distinctive, the tattoo was not inaccessible to the jury. Stern and the detective were not witnesses to the crimes and were not shown to be more likely to identify correctly the person in the photographs than the jurors, and so their opinion testimony was excludable upon objection. "[O]pinion evidence is admissible only where the conclusion of the expert is one which the jurors would not ordinarily be able to draw for themselves; i.e., the conclusion is beyond the ken of the average layman."[20]

It is apparent from trial counsel's testimony at the hearing on the motion for new trial that he did not seek to exclude the detective's and Stern's identification testimony on the basis of any strategic or tactical consideration. Authority indicating that a witness's opinion testimony as to the identity of a person depicted in a video was admissible as a question of fact, alone, had been overruled prior to Grimes's trial.[21] Further, trial counsel testified that the basis of Grimes's defense, made in consultation with Grimes, was misidentification: "that he was not the person who was depicted in the photographs." Inasmuch as the excludable testimony went to the heart of Grimes's defense, and trial counsel failed to object to the testimony based on his misapprehension of the law rather than any unwise choices of trial tactics and strategy, we conclude that Grimes's trial counsel's performance fell below an objective standard of reasonableness.[22]

We next consider whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[23] The state argues that, based on witness descriptions, the similarity of the crimes, and the photographic evidence, the conclusion is "inescapable" that the same man committed the August 23, 2004, May 4, 2005, and May 20, 2005, robberies. But even if the evidence is strong that the same man committed the robberies, the evidence that Grimes was that man,

---

[19] Stern was not asked if he identified Grimes from the photographs based on any distinctive characteristics.

[20] (Citation and punctuation omitted.) *Carter*, supra.

[21] See id., overruling in part *Jackson v. State*, 262 Ga. App. 451, 455 (6) (585 SE2d 745) (2003).

[22] See, e.g., *Joncamlae v. State*, 267 Ga. App. 214, 216-217 (1) (598 SE2d 923) (2004) (trial counsel deficient in failing to object to tainted in-court identification); *Mann v. State*, 252 Ga. App. 70, 72-73 (1) (555 SE2d 527) (2001) (trial counsel's failure to object to improper testimony bolstering witness's credibility constituted deficient performance).

[23] (Citation and punctuation omitted.) *Johnson*, supra at 78 (1).

apart from the inadmissible identification testimony of Stern and the detective, is not strong. No victim made an in-court identification of Grimes. One of the tellers refers to "the defendant" as having approached him, although the prosecutor proceeds to ask whether the person demanding money was male or female. The state does not contend that the witness's reference to "defendant" was an identification. One witness to the August 23, 2004, robbery agreed that the perpetrator was portrayed in the photographs taken from the surveillance camera, but the prosecutor showed the other witness one of the photographs, and she testified "it doesn't look like that person . . . the build was not like that." An officer testified that Grimes was arrested for an unrelated incident on August 25, 2004, and acknowledged that Grimes's book-in photograph on that date showed a "difference in appearance" from the witness description of the person who committed the bank robbery two days earlier.

The victim of the May 20, 2005, robbery tentatively identified Grimes from a photographic lineup, but she also testified that "I chose tentative because I wasn't really sure." According to a detective's testimony, the victim described the perpetrator to him as having a rust-colored beard, and the detective decided to include Grimes in the photographic lineup even though he knew that Grimes did not have a rust-colored beard. An investigator processed a countertop and door at the bank for fingerprints based on his review of the surveillance videotape and conversation with the teller that the perpetrator had placed his hands in a certain location. The investigator recovered latent fingerprints from the countertop and doors, but none was a match for Grimes.

The defense introduced evidence of Grimes's tattoos, including a large tattoo of two names on the side of Grimes's neck, which, according to Holmes, Grimes had at the time he and Grimes met. None of the victims reported seeing a tattoo on the robber, although the perpetrator wore T-shirts. The police searched Grimes's apartment on July 18, 2005, to look for physical evidence, such as clothing, which might connect Grimes to the bank robberies. They found clothing, but none that matched that worn by the person portrayed on the surveillance videos. Stern, who provided testimony implicating Grimes as a bank robber, was significantly impeached. Stern admitted during cross-examination that he had previously lied to police when he told them he had only committed one bank robbery, that he lied when he testified earlier that he had not lied to the police, and agreed that he had therefore "just lied to [the jury] under oath."

The trial court concluded that even if Grimes's trial counsel had been deficient in failing to object to the identification testimony, the exclusion of the testimony would not have changed the outcome of

the trial, considering, among other things, Stern's testimony implicating Grimes, and trial counsel's challenge to Stern's credibility on cross-examination and in closing argument. However, Stern did not profess to have any knowledge of the crimes for which Grimes was solely indicted. The trial court also found that "[t]he figure in the videotapes looked like the defendant." Even if this is true, the decision that this figure was in fact Grimes needed to be made by the jury, and Grimes's trial counsel allowed the jury's decision to be made in the context where the only unequivocal testimony that Grimes was the person depicted in the surveillance photographs was inadmissible. We conclude that, if the detective's and Stern's identification testimony had been excluded, there is a reasonable probability that Grimes would have been acquitted of the August 23, 2004, May 4, 2005, and May 20, 2005, robberies. Although Stern did implicate Grimes in the May 31, 2005, robbery, Grimes's identity as a participant in the latter robbery was significantly corroborated through evidence of his participation in the three earlier robberies. If there is a reasonable probability that, but for his trial counsel's deficient performance, a jury would have acquitted Grimes of the three earlier robberies, then there is a reasonable probability that Grimes would have been acquitted of the May 31, 2005, robbery as well.[24]

The trial court erred in concluding that Grimes had not received ineffective assistance of counsel. Grimes is entitled to a new trial, and the case is remanded for this purpose.

*Judgment reversed and case remanded. Smith, P. J., and Adams, J., concur.*

DECIDED MAY 20, 2008.

*Gerard B. Kleinrock*, for appellant.
*Gwendolyn Keyes Fleming, District Attorney, Barbara B. Conroy, Assistant District Attorney*, for appellee.

---

[24] In view of our findings, we need not address Grimes's contention that his trial counsel was also ineffective in abandoning his attempt to impeach the lead detective's testimony after the trial court had suggested an alternate route of impeachment.