**FIRST DIVISION**
**ELLINGTON, C. J.,**
**PHIPPS, P. J., and DILLARD, J.**

**NOTICE: Motions for reconsideration must be**
***physically received* in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**(Court of Appeals Rule 4 (b) and Rule 37 (b), February 21, 2008)**
**http://www.gaappeals.us/rules/**

**June 26, 2012**

# In the Court of Appeals of Georgia

A12A0301. JAMES v. THE STATE.

PHIPPS, Presiding Judge.

Steven James appeals his convictions for multiple counts of armed robbery, aggravated assault, possession of a knife during the commission of a crime, and one count of attempt to commit armed robbery. He contends the trial court erred by denying his motion for a directed verdict of acquittal, allowing the state to elicit improper hearsay testimony, and allowing the state to improperly impeach a witness. For the reasons that follow, we affirm.

Viewed in the light most favorable to the prosecution,[1] the evidence showed that on the evening of January 13, 2004, David Turner and J. G., a juvenile, attempted at knife-point to rob employees of a Taco Bell restaurant, and actually robbed at

---

[1] *Flores v. State*, 308 Ga. App. 368, 369 (1) (707 SE2d 578) (2011).

knife-point employees in a nearby Arby's restaurant, minutes later. James drove Turner and J. G. to the restaurants and stayed in the car while Turner and J. G. entered the restaurants armed with knives and wearing masks, and demanded money. After the incident at Arby's, the three fled in James's vehicle, with James driving. J. G. sat in the back seat of the car, and Turner sat in the front passenger seat. They were ultimately apprehended by the police.[2]

J. G. testified that on January 13, 2004, he went to James's house. J. G.'s mother and James were there. Turner arrived shortly thereafter. James, Turner, and J. G. left the house together; James drove. Turner explained to J. G., with James in the car, that they were going to rob some restaurants. Turner said that he had already told James about the plan. Turner handed J. G. a knife while they were in the car. When they arrived at the Taco Bell restaurant, James waited in the car while Turner and J. G. entered the restaurant, armed with knives and wearing face masks, and demanded money. But when their demands were ignored, they exited the restaurant and drove away. Turner and J. G. took off their masks when they got back in the car.

---

[2] James and Turner were jointly indicted for the crimes. Turner pled guilty prior to trial. J. G.'s case was disposed of in juvenile court.

They stopped next at an Arby's restaurant. Turner and J. G. entered the restaurant, armed with knives and wearing face masks, and demanded money. This time, their demands were met; they were given money. Turner and J. G. exited the restaurant and got back in the car; James drove them away. About 10 to 15 minutes later, the three individuals were arrested at a gas station.

1. James contends the trial court erred by denying his motion for a directed verdict of acquittal because in the state's case-in-chief, the only testimony connecting him with the crimes came from one of the alleged accomplices, J. G. He argues that none of the victims identified him as a perpetrator and no independent witnesses connected him with the planning or commission of the crimes.

James further argues that he had no knowledge about the attempted armed robbery of the Taco Bell restaurant because he had not discussed committing the robberies, and he stayed in the car while Turner and J. G. went inside and later came back outside without mentioning any attempt to commit a robbery inside. James asserts that he found out about the armed robbery at the Arby's restaurant only after its commission, when he was forced at knife-point by J. G. to drive away quickly. James denied that the knives identified at trial as having been used in the commission of the crimes belonged to him.

3

A motion for a directed verdict of acquittal should be granted only when there is no conflict in the evidence and the evidence with all reasonable deductions and inferences therefrom demands a verdict of acquittal as a matter of law. *On appeal, a reviewing court may consider all the evidence in the case*,[3] and must view the evidence in the light most favorable to the verdict. The test established in *Jackson v. Virginia*,[4] is the appropriate one to use when the sufficiency of the evidence is challenged, whether the challenge is from the denial of a directed verdict or the denial of a motion for new trial based upon alleged insufficiency of the evidence.[5]

The testimony of a single witness is generally sufficient to establish a fact. However, in certain cases, including prosecutions for treason, prosecutions for perjury, and felony cases where the only witness is an accomplice, the testimony of a single witness is not sufficient.[6]

A defendant may not be convicted on the uncorroborated testimony of an accomplice; however, only slight evidence of a defendant's identity and participation from an extraneous source is required to corroborate the accomplice's testimony and support the verdict. Sufficient

---

[3] *Bethay v. State*, 235 Ga. 371, 375 (1) (219 SE2d 743) (1975).

[4] 443 U. S. 307 (61 LE2d 560, 99 SC 2781) (1979).

[5] *Hammond v. State*, 303 Ga. App. 176, 181 (3) (692 SE2d 760) (2010) (citations omitted and emphasis supplied).

[6] OCGA § 24-4-8.

4

corroboration may consist of either direct or circumstantial evidence which connects the defendant with the crime, tends to show his participation therein, and would justify an inference of the guilt of the accused independently of the testimony of the accomplice.[7]

"If there is slight evidence of corroboration, the sufficiency of corroboration is peculiarly a matter for the jury."[8] "[T]he accused's own statement can serve to corroborate his accomplice's inculpatory testimony."[9] And "[w]hile mere presence at the scene of the commission of a crime is not sufficient evidence to convict one of being a party thereto, presence, companionship, and conduct before and after the offense are circumstances from which one's participation in the criminal intent may be inferred."[10]

---

[7] *Mosier v. State*, 223 Ga. App. 75 (476 SE2d 842) (1996) (citations and punctuation omitted); *Grimes v. State*, 291 Ga. App. 585, 588 (1) (662 SE2d 346) (2008); OCGA § 24-4-8.

[8] *Grimes*, supra.; *Floyd*, supra (jury generally determines the weight of the corroborating evidence, and even slight evidence of corroboration connecting the accused to a crime is legally sufficient).

[9] *Floyd v. State*, 272 Ga. 65, 66 (1) (525 SE2d 683) (2000) (citation omitted); *Moore v. State*, 245 Ga. App. 641, 643 (1) (a) (537 SE2d 764) (2000) (citation and punctuation omitted).

[10] *Mosier*, supra at 76.

Here, James's own testimony corroborated J. G.'s testimony and showed his participation in the commission of the crimes. James testified that he was with Turner and J. G. the evening that the crimes were committed and that he drove Turner and J. G. to the restaurants. In addition, J. G.'s mother (who was also James's mother-in-law) testified that on the day of the crimes, before they were committed, she heard Turner ask James's girlfriend for the keys to James's and his girlfriend's knife collection; she heard Turner tell James "something like this will work, it's been done before, it'll work, don't worry about it"; and she heard Turner say "something like, when we get back everyone's pocket will be filled."

J. G.'s mother testified also that before the three left she saw knives in the car and tried to get her son out of James's car. After the three left, J. G.'s mother noticed that the knife cabinet, which was always kept locked, was unlocked and it appeared that some knives were missing.

The evidence was sufficient to authorize a rational trier of fact to find beyond a reasonable doubt that J. G.'s testimony was corroborated and that James was the

"getaway" driver for J. G. and Turner and a participant in the commission of the crimes.[11]

2. James contends that the trial court committed harmful error by allowing J. G.'s mother to testify as to Turner's out-of-court's statements before the state had proved the fact of a conspiracy. We note that James's argument is not that the state failed to prove the existence of a conspiracy.

> OCGA § 24-3-5 provides that after the fact of conspiracy is proved, the declarations by any one of the conspirators during the pendency of the criminal project shall be admissible against all. Notwithstanding the first clause of the Code section, . . . such hearsay statements are admissible when the State at some point before the close of evidence establishes a prima facie case of conspiracy independent of the co-conspirator statement.[12]

Stated another way:

---

[11] *Floyd*, supra.; *Romero v. State*, 307 Ga. App. 348, 349-351 (705 SE2d 195) (2010); *Jones v. State*, 302 Ga. App. 147, 149 (1) (a) (690 SE2d 460) (2010) (accomplice testimony that the defendant was a participant in the crime was corroborated by, among other things, witness who overheard defendant speaking to accomplice about committing the robbery and defendant's own statement that he was with the accomplice for a period of time on the evening of the crime); *Mosier*, supra at 75-76.

[12] *Thorpe v. State*, 285 Ga. 604, 610 (5) (678 SE2d 913) (2009) (citations and punctuation omitted).

7

while it may generally be the better practice to require a prima facie case of conspiracy first to be made, before admitting evidence of the acts and declarations of [an] alleged conspirator[] there is no inflexible rule to that effect. The trial court has some discretion as to the order in which testimony may be introduced; and if a prima facie case of conspiracy is shown on the whole evidence, the admitting of such testimony is not error.[13]

Inasmuch as a conspiracy may be shown by proof of an agreement between two or more persons to commit a crime, J. G's testimony was sufficient to make a prima facie case of conspiracy.[14] And the trial court's admission of Turner's statements that were made in the presence of J. G.'s mother before the state proved the fact of the conspiracy did not constitute reversible error.[15]

3. (a) James contends that the trial court committed harmful error by allowing the state to impeach J. G. because J. G. gave no testimony that was inconsistent with any prior out-of-court statement he had given. James argues that J. G.'s out-of-court

---

[13] *Fallings v. State*, 232 Ga. 798, 799 (1) (209 SE2d 151) (1974) (citations and punctuation omitted).

[14] See *Copeland v. State*, 266 Ga. 664 (2) (a) (469 SE2d 672) (1996) (testimony of one co-conspirator sufficient prima facie evidence of conspiracy to enable admission of another co-conspirator's statement to third parties).

[15] *Thorpe*, supra; *Fallings*, supra.

"statement and his testimony were not contradictory, nor were they inconsistent, they were just not complete." But this contention is belied by the record.

At trial, the prosecutor asked J. G. whether James had "said anything about what you were supposed to do while you were inside the Taco Bell," and J. G. replied "No, ma'am." But when asked, later at trial, about prior statements he had given to the police regarding that matter, J. G.'s response was contradictory:

Q. (Prosecutor) Do you remember talking to the police about what had been said in the car by [James] before you went into the Taco Bell?

A. Yes, ma'am.

Q. Okay. And what did you tell the police that he had said?

A. I told them that while I was at the house, that –

Q. No, not while you were at the house. We're talking about in the car before you went to Taco Bell.

A. I'm not exactly sure what he said before I got out of the car. I mean, it –

Q. Do you remember – I'm sorry. Go ahead.

A. He just told us to come out quickly.

Q. He told you to come out quickly.

What were the words that you used that you told the police?

9

A. I don't remember. I can't remember that far back from that day.

Q. Do you remember that you told the police that he said hurry up?

J. G. confirmed that he had previously told the police that James told him and Turner to "be quick in there," and he told J. G. to listen to what Turner told him to do, to do what Turner told him to do, and to "be by [Turner's] side at all times"; if J. G. did not do what "they" told him to do, they would likely "use the weapons" against J. G.

In another instance, J. G. testified at trial that after the attempted robbery at Taco Bell and before the three went to Arby's, James stated "well, since that didn't work out, . . . we just shouldn't do it." But when later asked about prior statements he had given to the police regarding that matter, J. G. confirmed he had given a response which was inconsistent:

Q. Okay. But . . . when you gave the tape-recorded statement to the police . . . you told the police that, them two in the front, they tried to find another place to go get money from; the first place they thought of was Arby's, because there was not a whole lot of business there. . . . [James] and [Turner] gave me order[s] . . . to do what they said. [Turner] and I went in, but I was going by their orders."

A. Right.

10

Accordingly, James's contention is belied by the record and is therefore without merit.[16]

(b) James argues also that the procedure employed by the state to impeach J. G. was improper. James claims that the prosecutor's use of notes she had taken when previously listening to J. G.'s prior tape-recorded statement was improper because she should have instead used a transcript or actual recording of the prior statement.

> A witness may be impeached by contradictory statements previously made by him as to matters relevant to his testimony and to the case. Before contradictory statements may be proved against him, unless they are written statements made under oath in connection with some judicial proceedings, the time, place, person, and circumstances attending the former statements shall be called to his mind with as much certainty as possible. If the contradictory statements are in writing and in existence, they shall be shown to him or read in his hearing.[17]

"If a party *has knowledge* of a prior statement by the witness which contradicts the testimony the witness presently gives, the party has shown appropriate entrapment

---

[16] See *Hayward-El v. State*, 284 Ga. App. 125, 127 (2) (643 SE2d 242) (2007) (defendant's claim that he was not provided with a copy of the indictment, police reports, or medical reports was belied by the record and therefore without merit).

[17] OCGA § 24-9-83.

11

to entitle the impeachment of his witness by the use of the prior inconsistent statement, including the use of leading questions."[18]

Here, J. G. testified that he was arrested at a gas station and taken to a sheriff's department where he made a tape-recorded statement to the police, shortly after the crimes were committed. J. G. confirmed that before the police interviewed him, they tested him for the presence of alcohol in his body and that the police did not interview him while he was still intoxicated. J. G. testified that his mother was present when the police interviewed him and that the police read him some rights, which he understood. J. G. testified that the day before he testified at trial he had listened to the tape-recorded statement he had made to the police. Therefore, the time, place, person, and circumstances attending the former statement were called to J. G.'s mind.[19] Accordingly, James has failed to show that the procedure employed by the state to

---

[18] *McConnell v. State*, 166 Ga. App. 530, 532 (4) (304 SE2d 733) (1983) (emphasis added) (citing OCGA § 24-9-81; *Davis v. State*, 249 Ga. 309, 314 (3) (290 SE2d 273) (1982)); see *Duckworth v. State*, 268 Ga. 566, 568 (1) (492 SE2d 201) (1997) (Georgia's impeachment statute does not require that the prior inconsistent statement be admitted into evidence before it is used for impeachment purposes. Nor does the case law mandate the introduction of the prior written statement into evidence before questioning the witness).

[19] OCGA § 24-9-83.

impeach J. G. was improper; the prosecutor laid the foundation to use J. G.'s prior inconsistent statements.[20]

*Judgment affirmed. Ellington, C. J., and Dillard, J., concur.*

---

[20] See *Byrum*, supra; *Meschino v. State*, 259 Ga. 611, 613 (2) (385 SE2d 281) (1989) (foundation laid for use of prior inconsistent statements where witness acknowledged making statement to agent after the crime).