**FIRST DIVISION
ELLINGTON, C. J.,
PHIPPS, P. J., and BRANCH, J.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules/

**June 4, 2013**

# In the Court of Appeals of Georgia

A13A0293. HARRELL v. THE STATE.            PH-012C

PHIPPS, Presiding Judge.

Two masked men held up a gas station, making off with a substantial amount of cash. In connection with that incident, a jury found Julius Demetrius Harrell and his co-defendant guilty of armed robbery and possession of a firearm during commission of a crime (the armed robbery). Challenging his convictions therefor, Harrell contests the sufficiency of the evidence and the denial of his motion to sever his trial from that of his co-defendant. We affirm.

1. When an appellant challenges the sufficiency of the evidence to support a conviction, "the relevant question is whether, after viewing the evidence in the light

most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."[1]

So viewed, the evidence showed the following. The gas station was located in the City of Duluth, and functioned also as a check-cashing store. At about 8:30 p.m. on February 22, 2007, two men entered the store. Each man was wearing a mask that covered his head. One customer was inside the store. The store's clerk was in the back office, counting money. That room was located just behind the check-out counter, and an interior window permitted visual access between it and the customer shopping area. One of the masked men, using his left hand, pointed a handgun at the clerk. By the time the clerk realized that his life was being threatened, the second masked man had rounded the check-out counter, entered the back office, and ordered the clerk to the floor. The clerk instantly complied. The second masked man hurriedly collected the cash from the back office, including that which was hidden in unlocked file cabinet drawers, then stashed the collected cash in a bag he already had with him. The masked men fled the store, taking with them roughly $84,000 in U. S. currency.

---

[1] *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979).

The clerk summoned police, who confiscated a video-recording of the criminal episode, which was later shown to the jury. The clerk was never able to identify either robber, but recalled that the gunman was noticeably taller than the bagman. Police investigation led to a man who was later indicted for his involvement in the heist. That man entered a negotiated guilty plea, pursuant to which he testified as a witness for the state. At the underlying joint trial, he identified the two masked men: (i) Harrell (the appellant), as the bagman; and (ii) Manuel Miguel Rivera (who was Harrell's co-defendant at trial), as the gunman. Further, the man admitted that he had served as the getaway driver.

While on the stand, the getaway driver supplied these details about events before and after the armed robbery. Earlier on the date in question, he had picked up both Harrell and Rivera. As the three of them rode around plotting to commit an armed robbery, they cased and then selected the gas station, noting in particular its surveillance equipment, a back office, an opened door to that room just around the counter, and a money counter on a table in that back room. Rivera had with him a pistol with a scope, and he and Harrell purchased head masks. As the getaway driver surmised at trial, "[T]he whole plan was for [Rivera] to go in and pull out the gun and [Harrell] to go to the back room and get the money." Accordingly, upon returning to

3

the gas station with the weapon and masks, the three of them first monitored the activities upon the premises. Then, when there was only one customer inside the store, Harrell and Rivera left the vehicle and headed for the store. Each put on a head mask, and Rivera carried the firearm. Moments later, the two ran back to the waiting vehicle. Harrell was carrying a bag of money. Later that evening, Harrell and Rivera gave the getaway driver five thousand dollars of the stolen money.

The getaway driver, Harrell, and Rivera had attended the same high school, each graduating in 2005 or 2006. The getaway driver testified that Harrell was about 5'7" and Rivera was over 6 feet tall. Also, the getaway driver testified that Rivera was left-handed. The getaway driver had known neither Harrell nor Rivera to either work a job or own a vehicle. In February 2007, when the armed robbery was committed, Rivera was living with Harrell in an apartment.

On the morning after the armed robbery, Harrell and Rivera called the getaway driver and asked for a ride to a used-car lot. He agreed, and dropped them off. The next time he saw Harrell and Rivera, each was driving an SUV. The getaway driver further testified that, each time he saw Harrell and Rivera after the robbery, "they always had nice clothes and jewelry," and "everything was new. I kept seeing them wearing different clothes, different jewelry, so forth."

4

The used-car lot vice-president recalled assisting Harrell and Rivera as each picked out an SUV. He testified that on February 23, 2007, which was the day after the armed robbery, Harrell purchased a 1999 Ford Expedition, paying for the vehicle in cash; Rivera purchased on that day a 1998 Range Rover, making a $7,300 cash down payment. Five days later, Harrell and Rivera returned to the used-car lot. Harrell traded the Expedition for a Lincoln Navigator, paying an additional $2,000 in cash; Rivera paid in cash the approximately $2,500 balance remaining on his SUV.

A friend of Harrell testified that, as of late February 2007, Harrell was living with his mother and had no job – except that he occasionally "picked up a paycheck" from his mother. Yet, as the friend remembered, Harrell obtained an Expedition, and soon thereafter, "a nice – decent car." During that time, the friend had further noticed that Harrell had begun to acquire expensive clothing and other items. So the friend asked Harrell, "How did you obtain your money?" The friend testified that Harrell remained "tight-lipped" and would explain only that "it was a gravy lick." According to Harrell's friend, "Street terminology for a lick is either a robbery or maybe you come upon some money some way, somehow. You know, it has numerous amount of definitions or what have you."

5

Thus, the state called to the stand a police lieutenant who had worked for seventeen years with the City of Duluth Police Department, who was then assigned to the division of criminal investigations for robberies, and who had responded to between 75 and 100 armed robberies. On direct examination, the stated elicited the following:

Q: And based on your training and experience, what does the term "a lick" mean?

A: It's a street term for robbery.

Q: Do you know it to mean anything other than a robbery?

A: No, sir.

As a similar transaction to show Rivera's bent of mind and course of conduct, the state presented evidence of an armed robbery that had occurred at a sandwich shop three days before the armed robbery at the gas station. Like the gas station, the sandwich stop was located in Duluth. At about 8:30 p.m., a masked man about six feet tall entered the shop. He was carrying a handgun and a bag. There was no customer in the shop at the time, and the masked man aimed the weapon so that its red laser light reflected on the store's clerk. He approached the clerk and ordered her

6

to take the money out of the cash register and put it in the bag; she complied. Next, the gunman guided the clerk to a back room, where he ordered her to take the money out of a safe that was hidden underneath a table and to put that money in his bag; she complied. The man fled the store, taking with him between $500 and $600 of the store's cash. Based on her observations of the masked gunman, the clerk discerned that he was Rivera, with whom she had worked at the store for several months in late 2006. Additionally, she and the shop's co-owner, who also had worked with Rivera during those several months prior to that incident, testified that Rivera was left-handed. A video-recording of the armed robbery, which had been captured by surveillance equipment, was shown to the jury.

Neither Harrell nor Rivera testified. Rivera presented no witnesses, but Harrell called his mother to testify that he had once obtained a "settlement" and that he had worked prior jobs. Harrell's mother also testified that, in December 2006, Rivera had nowhere to live and had thus moved into her apartment, where Harrell also lived.

On appeal, Harrell maintains that the evidence was insufficient, pointing out that the gas station clerk was unable to identify him as one of the two masked men and that the video recording of the armed robbery failed to clearly depict either perpetrator's face. Therefore, Harrell argues that his felony convictions rested solely

on the uncorroborated testimony of an accomplice, the getaway driver, in violation of then applicable OCGA § 24-4-8.[2]

Under that Code section, "the testimony of an accomplice used to convict the [defendant] of a crime must be supported by independent corroborating evidence as to the identity and participation of the [defendant] tending to connect him to the crime."[3] However, "slight evidence of corroboration connecting the defendant with the crime satisfies the requirements of OCGA § 24-4-8 and that evidence may be entirely circumstantial. Also, evidence of the defendant's conduct before and after the crime may give rise to an inference that he participated in the crime."[4] Even "[the defendant's] own statement can serve to corroborate his accomplice's inculpatory

---

[2] When Harrell's trial was conducted in November 2008, OCGA § 24-4-8 (2008) pertinently provided that, "The testimony of a single witness is generally sufficient to establish a fact. However, in . . . felony cases where the only witness is an accomplice, the testimony of a single witness is not sufficient. Nevertheless, corroborating circumstances may dispense with the necessity for the testimony of a second witness."

[3] *Ladson v. State*, 248 Ga. 470, 475 (5) (285 SE2d 508) (1981) (citations and punctuation omitted).

[4] *Parkerson v. State*, 265 Ga. 438, 439 (2) (457 SE2d 667) (1995) (footnotes omitted).

testimony."[5] "The corroborating evidence need not be sufficient by itself to convict [a defendant], nor does the testimony of an accomplice need to be corroborated in every detail."[6]

Here, the state presented the requisite corroboration. The getaway driver's testimony about the heights of Harrell and Rivera was consistent with the gas station clerk's comparison of the heights of the bagman and the gunman. Additionally, the jury was authorized to find from the testimony of witnesses other than the getaway driver that, around the time of the armed robbery, Harrell had held no job and that he and Rivera lived with Harrell's mother; that the morning after approximately $84,000 in cash was taken during the armed robbery, Harrell paid cash for an SUV; and that five days after purchasing that SUV, Harrell paid an additional $2,000 in cash to trade it for another vehicle. The jury was authorized to find from the testimony of witnesses other than the getaway driver that, around this time, Harrell began wearing expensive clothing and other items which, together with acquiring two vehicles, attracted the attention of his friend who pointedly asked him, "How did you obtain your money?"

---

[5] *James v. State*, 316 Ga. App. 406, 408 (1) (730 SE2d 20) (2012) (footnote omitted).

[6] *Terrell v. State*, 271 Ga. 783, 786 (3) (523 SE2d 294) (1999) (citations omitted).

The jury was authorized to conclude from the testimony of witnesses other than the getaway driver that Harrell conveyed to his friend that he had obtained the money by committing robbery.

"The sufficiency of evidence corroborating the testimony of an accomplice is a matter for the jury, and [where, as here,] the verdict[s] [are] supported by 'slight evidence' of corroboration connecting the defendant with the crime[s], this court will not say that the evidence did not authorize the verdict[s]."[7] Therefore, this challenge to the sufficiency of the evidence fails.

2. Harrell contends that the trial court erred in denying his motion for directed verdict of acquittal.

> The standard for reviewing a denial of a motion for a directed verdict of acquittal is the same test to be used when the sufficiency of the evidence

---

[7] *Ladson*, supra (citation and punctuation omitted); see *Terrell*, supra; see generally *Jones v. State*, 271 Ga. 433-434 (520 SE2d 690) (1999) (determining that requisite corroboration was supplied for accomplice's testimony by defendant's own statement); *Cox v. State*, 243 Ga. App. 790-792 (534 SE2d 464) (2000) (determining that in prosecution for armed robbery at a store by two men, where one of the men had a towel wrapped around his face and removed $6,000 to $7,000 from a safe, corroboration was supplied by evidence, inter alia, that within 45 minutes of the crime, appellant was seen running out of a dirt path that led from the store and carrying a gun which he tried to conceal in a towel; footprints on that path led directly to the vacant apartment where appellant's mother had lived three weeks before; and within two hours of robbery, appellant was seen with "folded up, knots of money").

10

is challenged, i.e., under the rule of *Jackson v. Virginia*,[8] whether the evidence was sufficient for a rational trier of fact to find beyond a reasonable doubt that the defendant was guilty of the charged offense.[9]

Harrell argues that the state failed to exclude the possibility that the cash he used to purchase the SUVs was gained through lawful means, citing his mother's testimony that "he got a settlement" and that he had worked various jobs. Concerning the latter, Harrell's mother stated that he had "worked with me at my center as a after-school teacher"; that he had "worked odds and ends jobs" with "a carpet cleaning guy"; that he had done "security work" during a road race; that he had worked "through the school program" when he was in high school; and that he had worked at a grocery store when he was about 15 or 16 years old.

But Harrell's mother gave no details about the amounts or dates of any settlement monies received by him. And as to his employment history, Harrell's mother gave no relevant details concerning the duration of time Harrell worked or the amount of money earned through his employment. And even if she had, "the jury was authorized to disbelieve [Harrell's mother's] testimony and credit the testimony of the

---

[8] Supra.

[9] *Dorsey v. State*, 279 Ga. 534, 542 (3) (615 SE2d 512) (2005) (citations omitted).

11

[s]tate's witnesses."[10] It was for the jury "to resolve any conflicts or inconsistencies in the evidence, just as the credibility of the witnesses was a matter within the province of the jury."[11] When this court reviews the sufficiency of the evidence, "it does not re-weigh the evidence or resolve conflicts in witness testimony, but instead it defers to the jury's assessment of the weight and credibility of the evidence."[12]

Here, the getaway driver identified Harrell as the masked bagman during the armed robbery at the gas station. Evidence further showed that, around the time of the armed robbery, Harrell held no job and lived with his mother in her apartment; the week after roughly $84,000 in cash was taken during the gas station armed robbery, Harrell paid cash for an SUV, then paid additional cash to trade into another SUV; meanwhile, he upgraded his clothing and jewelry; and when asked by a friend how he had obtained the money, Harrell conveyed that he had committed robbery. Viewed in the light most favorable to the prosecution, the evidence authorized the jury to find

---

[10] *Mickens v. State*, 277 Ga. 627, 629 (593 SE2d 350) (2004) (citation omitted).

[11] *Mearidy v. State*, 287 Ga. 312, 313 (696 SE2d 61) (2010) (citations omitted); see *Foster v. State*, 273 Ga. 34, 35 (1) (537 SE2d 659) (2000) ("Questions as to the reasonableness of hypotheses are generally to be decided by the jury which heard the evidence.").

[12] *McLean v. State*, 291 Ga. 873, 874 (1) (738 SE2d 267) (2012) (citation and punctuation omitted).

that the state had proved beyond a reasonable doubt that Harrell was guilty of the crimes for which he was convicted.[13]

3. Harrell contends that the trial court erred by not granting his motion to sever his trial from that of his co-defendant, Rivera. Harrell claims that his convictions resulted from a prejudicial spillover effect of evidence against Rivera, citing the similar transaction evidence admitted only against Rivera.

The following three factors must be considered by a trial court when exercising its discretion in regard to a motion to sever in a case in which the death penalty is not sought:

> (1) Will the number of defendants create confusion as to the law and evidence applicable to each? (2) Is there a danger that admissible evidence against one defendant will be considered against the other despite the court's instructions? (3) Are the defenses antagonistic to each other or to each other's rights?[14]

---

[13] See *Jackson*, supra.

[14] *Williams v. State*, 280 Ga. 584, 587 (3) (630 SE2d 370) (2006) (punctuation and footnote omitted).

In this case, there was no showing that any confusion was engendered by the number of defendants or by the applicable law.[15] The record reflects that the trial court aptly instructed the jury that

> evidence of other acts or occurrences of Defendant Rivera that are sufficiently similar or connected, and therefore purportedly related to the offenses for which he is on trial, may be considered for the limited purpose of showing, if it does, the bent of mind and course of conduct of said defendant in the crimes charged in the case now on trial. Such evidence, if any, may not be considered by you for any other purpose, and may not be considered at all concerning the Defendant Harrell.

The trial court provided ample instructions on principles of parties to a crime, explaining further that the defendants were "on trial for the offenses charged in this bill of indictment only and not for any other acts or occurrences, even though such acts or occurrences may incidentally be criminal," and that "[t]hough you may consider all of the evidence as a whole, conviction of one defendant does not necessarily require conviction of another. You, the jury, must determine guilt or innocence of each defendant separately."

---

[15] See generally *Murphy v. State*, 263 Ga. App. 62, 63 (1) (587 SE2d 223) (2003) (noting that qualified jurors under oath are presumed to follow the trial court's instructions).

14

The defenses of Harrell and his co-defendant were not shown as antagonistic; "neither attempted to point the blame at the other. They simply argued that the prosecution had failed to meet its burden of proof."[16] And although Harrell asserts that the joint trial harmed him because the evidence against his co-defendant was stronger than the evidence against him, "it is not enough for the defendant to show that he would have a better chance of acquittal at a separate trial or that the evidence against a co-defendant is stronger. The defendant must show clearly that a joint trial prejudiced his defense, resulting in a denial of due process."[17] Harrell has made no such showing. Accordingly, he has not demonstrated that the trial court abused its discretion in denying his motion for a separate trial.[18]

*Judgment affirmed. Ellington, C. J., and Branch, J., concur.*

---

[16] *Moon v. State*, 288 Ga. 508, 510 (2) (705 SE2d 649) (2011).

[17] *Herbert v. State*, 288 Ga. 843, 845 (2) (708 SE2d 260) (2011) (citations omitted).

[18] See *Moon*, supra; *Herbert*, supra; *Williams*, supra at 587-588 (3); *White v. State*, 315 Ga. App. 54, 62-63 (7) (726 SE2d 548) (2012).